ACCEPTED
03-15-00313-CV
6023524
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/10/2015 3:56:40 PM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00313-CV

_____

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/10/2015 3:56:40 PM
JEFFREY D. KYLE
Clerk

# IN THE COURT OF APPEALS
# THIRD SUPREME JUDICIAL DISTRICT AT AUSTIN, TEXAS

_____

## HERMENIA JENKINS,

### Appellant,

### v.

## CROSBY INDEPENDENT SCHOOL DISTRICT AND
## MICHAEL L. WILLIAMS, COMMISSIONER OF EDUCATION,

### Appellees.

_____

## On Appeal from the 200th District Court of Travis County, Texas;
## Trial Court Cause No. D-1-GN-14-000619

_____

## BRIEF OF *AMICUS CURIAE*
## TEXAS ELEMENTARY PRINCIPALS AND SUPERVISORS ASSOCIATION

_____

DANIEL A. ORTIZ
State Bar No. 15323100
GIANA ORTIZ
State Bar No. 24053824

The Ortiz Law Firm
1304 West Abram Street, Suite 100
Arlington, Texas   76013
817-861-7984 Telephone
817-861-8909 Facsimile
dortiz@ortizlawtx.com
gortiz@ortizlawtx.com

ATTORNEYS FOR *AMICUS CURIAE* TEXAS
ELEMENTARY PRINCIPALS AND
SUPERVISORS ASSOCIATION

## IDENTITY OF PARTIES AND COUNSEL

*Amicus curiae* Texas Elementary Principals and Supervisors Association adopts the parties' identity of parties and counsel to the order appealed from, and supplements as follows:

Attorneys for *Amicus Curiae* TEPSA:

Daniel A. Ortiz
Giana Ortiz
1304 West Abram Street, Suite 100
Arlington, Texas 76013
817-861-7984 Telephone

## IDENTITY OF BRIEFING PARTY

Pursuant to Texas Rule of Appellate Procedure 11(b), this *amicus curiae* brief is tendered on behalf of Texas Elementary Principals and Supervisors Association.

## SOURCE OF FEE PAID

Pursuant to Texas Rule of Appellate Procedure 11(c), this *amicus curiae* brief is funded wholly by Texas Elementary Principals and Supervisors Association, by and through member contributions.

# TABLE OF CONTENTS

**Cases**                                                                                          **Page**

IDENTITY OF PARTIES AND COUNSEL ................................................ i

TABLE OF CONTENTS ...................................................................... ii

INDEX OF AUTHORITIES ................................................................ iii

INTEREST OF *AMICUS CURIAE* TEPSA .............................................. 1

STATEMENT OF THE CASE ............................................................... 2

ISSUES PRESENTED ........................................................................ 2

STATEMENT OF FACTS ................................................................... 2

SUMMARY OF ARGUMENT ............................................................. 3

ARGUMENT .................................................................................. 4

        I.     The Unique Role of Principal ...................................... 4
              A.    Principals Are Treated as Unique by the Legislature...... 6
              B.    Principals Are Treated as Unique by the School
                    Community ...................................................... 9

        II.    "Principal" Is a Protected "Professional Capacity" .................. 10

        III.   Jenkins' Contract is Not an "Administrator Contract"............ 14

        IV.   The Commissioner's Decision is Not Entitled to Deference... 16

PRAYER ..................................................................................... 17

CERTIFICATE OF SERVICE .................................................... 20

APPENDIX INDEX .................................................................. 21

# INDEX OF AUTHORITIES

**Cases**                                                         **Page**

*French v. School Bd.*, 568 So. 2d 497 (Fla. Dist. Ct. App. 1990) ...................... 11

*Joyce v. Spring-Ford Area Sch. Dist.*,
600 A.2d 1302 (Pa. Commw. Ct. 1991) ........................................................ 11

*Murphy v. St. Paul Pub. Schs.*, 795 N.W.2d 30 (Minn. Ct. App. 2011) ............ 11

*Pub. Util. Comm'n v. Gulf States Utils. Co.*,
809 S.W.2d 201 (Tex. 1991) ............................................................... 3, 17

**Commissioner Decisions**

*Barich v. Canadian Independent School District*,
Docket No. 106-R1-585 (Comm'r Educ. 1985) ........................................ 12, 14

*Jenkins v. Crosby Independent School District*,
Docket No. 043-R10-1211 (Comm'r Educ. 2013) ....................... 12, 13, 15, 16

*Lehr v. Ector County Independent School District*,
Docket No. 003-R3-0908 (Comm'r Educ. 2011) ............................. 3, 8, 13, 17

*Pasqua v. Fort Stockton Independent School District*,
Docket No. 011-R3-1102 (Comm'r Educ. 2004) ........................................... 12

*Ramos v. El Paso Independent School District*,
Docket No. 002-R10-900 (Comm'r Educ. 2002) ........................................... 12

*Tuck v. Alief Indep. Sch. Dist.*,
Docket No. 008-R10-1007 (Comm'r Decision 2012) ............................... 14, 15

*Veliz v. Donna Independent School District*,
Docket No. 011-R3-999 (Comm'r Educ. 2000) ............................................ 12

*Wheeler v. Austin Independent School District*,
   Docket No. 008-R3-1108 (Comm'r Educ. 2011) ........................................... 14

**Statutes**

19 TEX. ADMIN. CODE § 149.2001 ..................................................................... 8
19 TEX. ADMIN. CODE § 232.2 (b) ..................................................................... 8
19 TEX. ADMIN. CODE § 241.1 ........................................................................... 8
19 TEX. ADMIN. CODE § 242.1 ........................................................................... 8
TEX. EDUC. CODE § 11.201 ................................................................................ 6
TEX. EDUC. CODE § 11.201(a)) ........................................................................... 3
TEX. EDUC. CODE § 11.202 ........................................................................ 3, 6, 7
TEX. EDUC. CODE § 11.202(a) ............................................................................ 3
TEX. EDUC. CODE § 11.253 ................................................................................ 7
TEX. EDUC. CODE § 21.046 ................................................................................ 8
TEX. EDUC. CODE § 21.201(1) ...................................................... 10, 12, 14, 15, 16
TEX. EDUC. CODE § 21.202 .......................................................................... 10, 11
TEX. EDUC. CODE § 21.206 .............................................................................. 10
TEX. EDUC. CODE § 21.206(b) .......................................................................... 16
TEX. EDUC. CODE § 21.211 .............................................................................. 10
TEX. EDUC. CODE § 21.354 ................................................................................ 7
TEX. FAMILY CODE § 52.02(7) ........................................................................... 9

**Rules**

Texas Rule of Appellate Procedure 38.1 ............................................................... 2

**Board Policies**

Crosby Indep. Sch. Dist. Bd. Policy DP (Local) ................................................... 7
Crosby Indep. Sch. Dist. Bd. Policy FOE (Legal) ................................................. 9

## INTEREST OF *AMICUS CURIAE* TEPSA

Formed in 1917, the Texas Elementary Principals and Supervisors Association ("TEPSA") consists of some 5,800 Pre-K-8th grade principals and supervisors working in the public schools of Texas. TEPSA provides support for its members by way of advocacy, legislative representation, and professional development. TEPSA members are the chief leaders in hundreds of public school districts across the state, in rural, urban, and suburban areas. The vast majority of TEPSA members serve as principals and assistant principals in public elementary schools. TEPSA is interested in this case because the ability of a school district to unilaterally transfer Texas public school principals to any position other than principal creates a career crisis, and economic detriment, from which TEPSA seeks to protect Texas public school principals. TEPSA further seeks to promote the legal rights of such principals throughout Texas.

Each of the thousands of educators serving Texas public school children plays a vitally important role in our state's future. Principals, not unlike superintendents, serve a uniquely crucial role: As the superintendent is the chief instructional leaders of the school district, the principal is the chief instructional leader of the school building. It takes a great deal of dedication, personal sacrifice, and devotion to service to become a principal. Those individuals who

have succeeded in attaining the credentials and experience to become a principal should not be unilaterally demoted to a non-principal position without some form of notice and hearing. The title is not easily earned and should not be freely stripped away.

## STATEMENT OF THE CASE

This is an appeal from a decision of the Texas Commissioner of Education (the "Commissioner"). This *amicus curiae* brief is presented to the Court advocating a reversal of the Commissioner's decision by way of an appropriate and equitable interpretation of the statutes and case law.

## ISSUES PRESENTED

Pursuant to Texas Rule of Appellate Procedure 38.1, TEPSA presents this brief not to raise additional issues but to advocate a position on issues raised by the parties.

## STATEMENT OF FACTS

TEPSA adopts the parties' statements of the facts to the extent such facts are undisputed. To the extent there exist disputed facts, TEPSA does not take a position on such facts unless otherwise noted herein.

## SUMMARY OF THE ARGUMENT

Involuntarily stripping the principal of a principal's title is tantamount to a public termination—the effect on the educator's reputation and earning potential being swift and not easily reversed. TEPSA does not posit that Texas principals have a right to a principal's position, but rather that Texas principals have a right to process before being stripped of that title. Because the principal's role garners unique treatment both under the law and in the school district community, to strip the principal of the title and duties constitutes a deprivation of a property interest such that due process is required.

First, the legislature treats a principal and a superintendent differently than any other person employed by a school district—but agency law has not abided by that distinction. Agency law through Commissioner's decisions, reflects application of an arbitrary distinction between superintendent—as "*sui generis*" the educational leader and chief executive officer of the school district—and treats all other "administrators" as equal. *E.g.*, *Lehr v. Ector County Ind. Sch. Dist.*, Docket No. 003-R3-0908 (Comm'r Educ. 2011) (quoting TEX. EDUC. CODE § 11.201(a)). This distinction ignores the plain language of the statute which also identifies the principal's role as *sui generis* on the campus—"the instructional leader of the school." TEX. EDUC. CODE

§ 11.202(a). The principal, unlike any other person on a campus, has a statutorily defined role and attendant duties. TEX. EDUC. CODE § 11.202.

Second, the principal's visibility in the community is second only to that other unique role—the superintendent. Principal reassignments are public events and, thanks to the internet, follow the principal for the rest of her career. The courts' duty of deference to agency decisions does not permit this Court to affirm the agency's decision where, as here, it is inconsistent with the statute. *See Pub. Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991). This Court should overturn the Commissioner's decision in this case to apply fundamental principles of statutory construction. The notion that the legislature meant to treat a superintendent as beyond compare—but treat the principal as if she were any other "administrator"—is a fiction created by the Commissioner and which must be corrected by this Court.

## ARGUMENT

### I. The Unique Role of Principal

The principal is the single chief instructional leader of each public school campus in Texas. The principal reports directly to the highest ranks in the school district—the superintendent(s) and the elected school board. The principal is charged with direction of all activities on a campus from custodial

and maintenance services, to athletics, extracurricular activities, instruction, and testing. In this role, the principal performs a balancing act at all times—implementing policy promulgated by central administration, while maintaining high standards and morale on the campus. At times forced to choose sides (*e.g.*, central office vs. teachers, parent vs. teacher, student vs. student, parent vs. parent, etc.), there are some battles a principal cannot win. The principal must make the most reasonable and intelligent choice with the information she has at that given moment, and face the fallout.

For this reason, and because almost every reassignment will constitute a demotion for the principal, the position dictates some minimal process to insulate principals from the inherent political risks associated with the job. That is, when a principal is "reassigned" to a role of significantly less authority (as is any non-principal role), this information is not only reflected on the person's work history but it is also a very public event. It makes the newspapers and television news, even in large cities. However, a demotion from a principal position—the chief instructional leader position—to assistant principal, attendance coordinator, or any other non-principal position has the same practical effect for the educator as a termination or nonrenewal without requiring the school districts to abide by the procedures set forth in the Texas

Education Code. By permitting the school districts to circumvent those processes to avoid risks, or inconvenience, the Commissioner's decision in effect condones the school district's *de facto* termination or nonrenewal without the due process protections afforded Texas educators in the Texas Education Code.

**A.** ***Principals Are Treated as Unique by the Legislature.*** Like superintendents, the role and duties of a principal are expressly set forth by statute. State law defines the job duties for superintendent and principal. TEX. EDUC. CODE §§ 11.201, 11.202. *All other school positions* are subject to being completely defined by the school district—through the superintendents and principals or their designees. There is no mystery as to the principal's duties. The duties, and the role, are clearly stated in state law, and may be augmented by the school district.

Specifically:

a.  The principal of a school is the instructional leader of the school and shall be provided with adequate training and personnel assistance to assume that role.

b.  Each principal shall:

1.  Except as provided by Subsection (d), approve all teacher and staff appointments for that principal's campus from a pool of applicants selected by the

district or of applicants who meet the hiring requirements established by the district, based on criteria developed by the principal after informal consultation with the faculty;

2.   set specific education objectives for the principal's campus, through the planning process under Section 11.253;

3.   develop budgets for the principal's campus;

4.   assume the administrative responsibility and instructional leadership, under the supervision of the superintendent, for discipline at the campus;

5.   assign, evaluate, and promote personnel assigned to the campus;

6.   recommend to the superintendent the termination or suspension of an employee assigned to the campus or the nonrenewal of the term contract of an employee assigned to the campus; and

7.   perform other duties assigned by the superintendent pursuant to the policy of the board of trustees.

TEX. EDUC. CODE § 11.202; *see also* Crosby Indep. Sch. Dist. Bd. Pol'y DP(Local) (setting forth additional qualifications unique for the principal).

Principals not only have a unique job description provided by state law, principals are also assessed by specific statutory appraisal guidelines, separate and apart from teachers, assistant principals, and other administrators. *See* TEX. EDUC. CODE § 21.354. The Texas Administrative Code also sets forth

professional standards for principals as distinct from teachers, assistant principals, and other administrators. *See* 19 TEX. ADMIN. CODE § 149.2001. Moreover, unlike for any other administrator position, state law dictates the certification requirements for superintendent and principal. TEX. EDUC. CODE § 21.046. Additionally, there are only two categories of administrator certificates in Texas: the superintendent and principal. *See* 19 TEX. ADMIN. CODE §§ 241.1 *et seq.*, §§ 242.1 *et seq.*[1]

The school district in this case has asserted that because an assistant principal is required to hold a principal's certificate, the two positions are equal for reassignment purposes. Using this same analysis, a superintendent could be reassigned to be a principal, because a superintendent is required to hold a principal's certificate. However, the Commissioner has prohibited such demotion. *E.g.*, *Lehr v. Ector County Ind. Sch. Dist.*, Docket No. 003-R3-0908 (Comm'r Educ. 2011). Indeed, the arbitrary distinction between the protection afforded to the superintendent from unlawful reassignment to principal— whereas the principal's demotion to assistant is lawful—has no support in the statutes.

---

[1] 19 TEX. ADMIN. CODE § 232.2 (b): Classes of certificates include the following: 1. superintendent; 2. principal; 3. classroom teacher; 4. instructional educator other than classroom teacher, including reading specialist; 5. master teacher; 6. school librarian; 7.

**B.** *Principals Are Treated as Unique by the School Community.*

Principals are unique, indispensable, members of the campus community. For each public school campus in this state, there exists only one principal. The same is not true for assistant principals. Indeed, each principal is aided in that role by one or several "assistants," depending on the size of the campus. A principal is strengthened and the campus is made more successful with a good assistant principal. The principal often delegates responsibilities related to student discipline, teacher appraisals, special education, lunch duty, bus duty, textbooks, and others to her assistant. *See, e.g.*, Tex. Family Code § 52.02(7) (providing that a principal or his designee must assume responsibility of a child taken into custody and returned to the school); Crosby Indep. Sch. Dist. Bd. Pol'y FOE(Legal) (permitting the principal or his designee to place a student in alternative education or expel a student immediately under certain conditions). Delegation and designation of duties is left to the discretion of the principal and varies from campus to campus. The assistant's job is to carry out the duties as assigned by the principal. While the assistant principal is a crucial component of the well-oiled campus machinery, the reality is that no person on the school district staff—from the paraprofessional to the superintendent—considers the

school counselor; 8. educational diagnostician; and 9. educational aide.

assistant to be the "same professional capacity" as the principal. The legal fiction that they are the "same professional capacity" exists only in Commissioner decisions and finds no support either in the law or in practice.

## II.  "Principal" Is a Protected "Professional Capacity"

Chapter 21 of the Texas Education Code provides certain protections and procedures for the nonrenewal or the termination of the educator, affording the educator (or principal, as in this case) notice of the reasons for the adverse employment action, and an opportunity for a hearing. *See* TEX. EDUC. CODE §§ 21.206, 21.211. However, when the educator is reassigned, such procedural protections are not invoked—unless the reassignment constitutes a "change in professional capacity." Texas Education Code § 21.202 provides that if the school district does not nonrenew the educator contract, that the teacher must be employed in the *same professional capacity* for the following school year.[2]

That is, the Texas Education Code § 21.201(1) defines "teacher" broadly: "A superintendent, principal, supervisor, classroom teacher, counselor, or other

---

[2] The District and the Commissioner have relied on the well-established right of public school supervisors to reasonably reassign personnel. And indeed, the vast majority of professional employment contracts contain a reassignment clause like Jenkins' that says something similar to this: "The District shall have the right to assign or reassign the Employee to positions, duties, or additional duties and to make changes in responsibilities, work, or transfers, at any time during the contract term." However, the reassignment authority is always limited by the professional capacity of the employee.

full-time professional employee who is required to hold a certificate issued under Subchapter B, or a nurse." Just five sections later, § 21.202 says that the "teacher" must be employed in the *same professional capacity* for the following school year unless the school board elects to nonrenew the employee's contract. Plainly, "principal" is a specific subset of the broadly defined "teacher," and is considered by the legislature to be a distinct professional capacity. When the principal is reassigned to a different professional capacity—for example to an assistant principal—TEPSA argues that such reassignment constitutes a termination or nonrenewal of the existing contract with the teacher and invokes certain rights to process. *See also Joyce v. Spring-Ford Area Sch. Dist.*, 600 A.2d 1302 (Pa. Commw. Ct. 1991) (transfer of principal to newly created coordinator position in central office constituted a demotion); *French v. School Bd.*, 568 So. 2d 497 , 498-99 (Fla. Dist. Ct. App. 1990) (transfer of elementary school principal to position of assistant junior high school principal affects substantial interests and therefore requires a hearing); *Murphy v. St. Paul Pub. Schs.*, 795 N.W.2d 30 (Minn. Ct. App. 2011) ("[The principal] suffered a reduction in rank or a transfer to a lower branch of service when she was assigned to an assistant-principal position.").

In this case, the Commissioner devotes a great deal of discussion to the

concept of "same professional capacity." *Jenkins v. Crosby Indep. Sch. Dist.*, Docket No. 043-R10-1211 (Comm'r Educ. 2013). However, the legislative history and statutory analysis therein sheds little or no light on why principals— unlike the other professional capacities set forth in § 21.201(1), including superintendent, teacher, and nurse, have been excluded from recognition as a "professional capacity." The end result is arbitrary and detrimental: A superintendent is a superintendent. A teacher is a teacher. A counselor is a counselor. A librarian is a librarian. A nurse is a nurse. But all "administrators" are equal.[3]

The Commissioner has arbitrarily interpreted "administrator" broadly to include assistant elementary school principal, high school principal, middle school assistant principal, attendance coordinator, and others. *See e.g.*, *Pasqua v. Fort Stockton Ind. Sch. Dist.*, Docket No. 011-R3-1102 (Comm'r Educ. 2004); *Ramos v. El Paso Ind. Sch. Dist.*, Docket No. 002-R10-900 (Comm'r Educ. 2002); *Veliz v. Donna Ind. Sch. Dist.*, Docket No. 011-R3-999 (Comm'r

---

[3] And indeed, teacher/coaches, teacher/deans, nurses, and counselors have all been preserved as a "professional capacity" by Commissioner's decisions. *E.g.*, *Jenkins v. Crosby Ind. Sch. Dist.*, Docket No. 043-R10-1211 (Comm'r Educ. 2013) ("A classroom teacher cannot be reassigned as a counselor. A counselor cannot be reassigned as a nurse. A nurse cannot be reassigned as a librarian."); *Barich v. Canadian Ind. Sch. Dist.*, Docket No. 106-R1-585 (Comm'r Educ. 1985).

Educ. 2000). This broad interpretation of the word "administrator," by which the Commissioner erroneously equates principal with any number of other administrative positions, becomes an improper circumvention of the due-process type protections set forth in the Texas Education Code. Principals are entitled to the nominal legal protections that come with the unique nature of the job as evidenced by state law.

The Commissioner's approach to analyzing administrator reassignments is not workable. Prior Commissioner's decisions equate all administrators, other than the superintendent, paving the way for school districts to reassign a principal to any other administrative or quasi-administrative position. *Lehr v. Ector County Indep. Sch. Dist.*, Docket No. 003-R3-0908 (Comm'r Educ. 2011). However, and as set forth *supra*, one can clearly conclude that the legislature intended for principals to be treated as unique, and deserving of protection from reassignments.

In the decision before the Court, the Commissioner portends that to recognize the principal's status would be to overturn decades of precedent. TEPSA respectfully disagrees. Pursuant to the plain language of the statute, principals are among the specifically identified protected professional capacities. *Jenkins v. Crosby Ind. Sch. Dist.*, Docket No. 043-R10-1211

(Comm'r Educ. 2013). A correct reading of the statute does not equate to a sea change in all administrator reassignment cases. The traditional factors—including duties, responsibilities and salaries—would apply to consider the comparative "professional capacity" of non-principal administrator positions. *See Barich v. Canadian Ind. Sch. Dist.*, Docket No. 106-R1-585 (Comm'r Educ. 1985). The Commissioner's analysis has heretofore failed to explain why principals are excluded as a "professional capacity" when they are specifically named in Texas Education Code § 21.201(1).

## III.  Jenkins' Contract Is Not an "Administrator" Contract

Educator employment contracts must contain a valid "professional capacity." *See, e.g.*, *Tuck v. Alief Indep. Sch. Dist.*, Docket No. 008-R10-1007 (Comm'r Decision 2012); *Wheeler v. Austin Indep. Sch. Dist.*, Docket No. 008-R3-1108 (Comm'r Educ. 2011). Such a professional capacity may be "broad," but not overly broad.[4]  *See Tuck v. Alief Indep. Sch. Dist.*, Docket No. 008-R10-

---

[4] However, there is no remedy for a school-district employee when her employer fails to follow this requirement. Rather, the Commissioner asserts that he will protect school employees from school districts that abuse their reassignment authority, but he has shown little or no inclination to do so with administrator reassignments. In response, school districts have broadened the employment categories to a point beyond recognition. A "teacher" contract is apparent on its face. But, what about "administrator"? Or, as in the case of Ms. Jenkins' contract, an "employee"? Neither is decipherable and both are intended to be as broad as possible to insulate the school district from any claims of wrongful reassignment. Their breadth, at least as applied to principals, is an abuse by the school district of its right to reassign.

1007 (Comm'r Decision 2012). In Ms. Jenkins's contract, her professional capacity was defined only as "employee." *Jenkins v. Crosby Ind. Sch. Dist.*, Docket No. 043-R10-1211 (Comm'r Educ. 2013). "Employee" is overly broad and not a legitimate professional capacity. *See Tuck v. Alief Indep. Sch. Dist.*, No. 008-R10-1007 (Comm'r Decision 2012). Where the professional capacity listed in the contract is not legitimate, the Commissioner holds that he "must then evaluate the two positions primarily by comparing professional duties and responsibilities but also including other factors such as salary and who an employee reports to." *See id.* Here, the Commissioner improperly inserted the word "administrator" into Jenkins' contract, where it did not exist. *Jenkins v. Crosby Ind. Sch. Dist.*, Docket No. 043-R10-1211 (Comm'r Educ. 2013). Based on that improper reconstruction of the contract terms, the Commissioner is able to justify his own holding as consistent with prior decisions. A review of Ms. Jenkins' position which she had held for a number of years (principal), the duties attendant to that position, and a review of § 21.201(1) should have led the Commissioner to an easy result: Jenkins was hired as a principal. When given the opportunity to repair the contract to the employee's favor, and in

compliance with statutes and contract law, the Commissioner went in the opposite direction.[5]

## IV.  The Commissioner's Decision Is Not Entitled to Deference

The Commissioner writes:  "Precedent should not be lightly overturned. Teachers and school districts base important decisions in reliance on Commissioner's Decisions."  *Jenkins v. Crosby Indep. Sch. Dist.*, Docket No. 043-R10-1211 (Comm'r Educ. 2013).  It is exactly for this reason that this case is so important.   The Commissioner's decision equating "principal" and "administrator" will be relied upon and exploited by school districts—and it is contrary to the plain language of the statute.   In making statements such as, "The positions described in the first sentence of Texas Education Code section 21.201(1) *may or may not be* professional capacities for purposes of Texas Education Code section 21.206(b)," the Commissioner exhibits a disregard for the language of the statute.  *Jenkins v. Crosby Indep. Sch. Dist*., Docket No. 043-R10-1211 (Comm'r Educ. 2013) (emphasis added).  In drawing arbitrary

---

[5] Educator contracts specifying "Administrator" professional capacity are very common but problematic in a way not experienced with any other contract category.   Administrator contracts are used for every administrator position from assistant superintendent to textbook coordinator; from principal to transportation director.  The range and breadth of the possible reassignments for administrators is greater than for any other job category, and is limited only by the imagination of the district.  There is a wider hierarchy of "administrator" positions than in the other professional categories.  That is why this case is so important.  The commissioner has reached a point where he approves every administrator reassignment, because in his view,

lines which include superintendents and counselors as professional capacities—while creating a new label for principals as "administrators"—the Commissioner's holding is wholly inconsistent with the language of the statute.

Further, affording superintendents reassignment protections as "*sui generis*" the educational leader and chief executive officer of the school district ignores the legislature's treatment of superintendents and principals congruently. *E.g.*, *Lehr v. Ector County Ind. Sch. Dist.*, Docket No. 003-R3-0908 (Comm'r Educ. 2011). That is, the superintendent and principal are the same in that they are both treated *differently* by the legislature. The Commissioner's refusal to do the same is arbitrary and inconsistent with the language of the statute. As such, the decision is not entitled to deference of this Court. *See Pub. Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991).

## PRAYER

It has been said that no one in a school district has a harder job than the principal. Every day, these leaders serve thousands of campuses filled with children of diverse ethnic, socio-economic, and cultural backgrounds, who come to school, each with his own educational history and needs. The public

one administrator is like another.

schools turn no child away.  The principals serve the families—as community and instructional leaders.  They serve legions of professional and supporting staff from the custodians to the head football coach.  No person within a school district is expected to wear more hats than the principal.

The Commissioner has missed the mark in interpreting a principal to be the same professional capacity as an assistant principal—or as a general "administrator."  The treatment of the position in the statutes, along with the clear language therein, point toward an intent of the legislature to distinguish the principal from other administrators.  It is beyond reason to read the statute, as the Commissioner does, to equate "principal" with the word "administrator."  TEPSA prays this Court would overturn the Commissioner's decision in this case to apply fundamental principles of statutory construction.

Dated:      July 10, 2015

Respectfully submitted,


__/s/ *Giana Ortiz*_____
DANIEL A. ORTIZ
State Bar No. 15323100
GIANA ORTIZ
State Bar No. 24053824

The Law Office of Daniel A. Ortiz
1304 West Abram Street, Suite 100
Arlington, Texas   76013
817-861-7984 Telephone
817-861-8909 Facsimile
dortiz@ortizlawtx.com
gortiz@ortizlawtx.com

ATTORNEYS FOR *AMICUS CURIAE*
TEXAS ELEMENTARY PRINCIPALS
AND SUPERVISORS ASSOCIATION

## CERTIFICATE OF COMPLIANCE

I certify that this Brief was produced on a computer using Microsoft Word 2007 and contains 4,256 words, as determined by using the computer software's word-count function, excluding the sections of the Brief listed in Texas Rule of Appellate Procedure 9.4(i)(1).

Signed this 10th day of July 2015.


__/s/ *Giana Ortiz*_____
Giana Ortiz

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Texas Rules of Procedure and the Texas Rules of Appellate Procedure, I certify that a true and correct copy of the foregoing document was served on the following person by certified mail, return receipt requested, and by email on the 10th of July, 2015:

David Hodgins
Thompson & Horton LLP
3200 Southwest Freeway, Suite 2000
Houston, TX 77027
dhodgins@thompsonhorton.com

Kevin F. Lungwitz
The Lungwitz Law Firm, P.C.
3005 S. Lamar Blvd.
Suite D-109-362
Austin, Texas 78704-4785
kevin@lungwitzlaw.com

Andrew Lutostanski
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
Andrew.lutostanski@texasattorneygeneral.gov

__/s/ *Giana Ortiz*_____
Giana Ortiz

# APPENDIX

A.     Cases:

*Public Utility Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991)


B.     Decision of the Texas Commissioner of Education:

*Pasqua v. Fort Stockton Independent School District*, Docket No. 011-R3-1102 (Comm'r Educ. 2004)


C.     Crosby Indep. Sch. Dist. Board Policies:

Policy DP (Local)
Policy FOE (Legal)

# APPENDIX A

A

Caution
As of: August 4, 2014 12:48 PM EDT

# Public Utility Com. v. Gulf States Utilities Co.

Supreme Court of Texas
April 3, 1991, Delivered
No. C-9731

Reporter: 809 S.W.2d 201; 1991 Tex. LEXIS 42; 34 Tex. Sup. J. 495

PUBLIC UTILITY COMMISSION OF TEXAS and OFFICE OF PUBLIC UTILITY COUNSEL, Petitioners, v. GULF STATES UTILITIES COMPANY, Respondent

**Subsequent History:** [**1] Dissenting Opinion of June 19, 1991.

**Prior History:** From Travis County; Third District.

## Core Terms

ratepayers, cogeneration, qualifying, rates, purchases, costs, electric utility, regulations, Venture, energy, plants, electricity, customers, public interest, public utility, negotiated, shareholders, proceeds, facilities, factors, requirements, contractual, incremental, provides, industrial, substantial evidence, federal regulation, arrangements, state regulation, electric energy

## Case Summary

### Procedural Posture

Petitioner Public Utility Commission sought review of a judgment from the Court of Appeals (Texas) that reversed petitioner's final order approving respondent utility company's request to sell and then repurchase generating units, but imposed conditions regarding the recovery of payments in excess of avoided costs and allocation of proceeds. Petitioner asserted its decision was supported by substantial evidence.

### Overview

The court affirmed a judgment that reversed a final order of petitioner Public Utility Commission. Respondent utility company proposed to sell two generating units to a joint venture, then purchase the entire electrical output from the plants for distribution to its customers. Applying the state and federal regulations governing the purchase of power from a qualifying co-generating facility, petitioner allowed the sale, but prohibited respondent from recovering from its ratepayers payments in excess of respondent's avoided costs and required respondent to divide the proceeds of the sale between ratepayers and shareholders. The court held that the restrictions regarding avoided costs, found in 16 Tex. Admin. Code § 23.66(e) (1988), did not apply to voluntary contracts arranged outside the requirements of 16 Tex. Admin. Code § 23.66(d), but only applied to compelled purchases. The court held that petitioner's decision regarding the allocation of proceeds was not supported by substantial evidence and did not take all relevant factors into consideration. The court remanded for determination of proper allocation and to allow respondent to recover purchased price payments.

### Outcome

The court affirmed the judgment that reversed petitioner's final order. The court held that the restrictions on recovery of payments in excess of avoided costs did not apply to voluntary arrangements with qualifying co-generating facilities and that respondent should be allowed to recover those costs. The court held that allocation of proceeds was not supported by substantial evidence and remanded for redetermination.

## LexisNexis® Headnotes

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Cogeneration & Independent Companies > Public Utility Regulatory Policies Act > General Overview

Energy & Utilities Law > Cogeneration & Independent Companies > Public Utility Regulatory Policies Act > Purchasing Requirements

Energy & Utilities Law > Electric Power Industry > State Regulation > General Overview

*HN1* To encourage cogeneration, Congress enacted § 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), *16 U.S.C.S. § 824a-3.* An obstacle to the development of cogeneration facilities in the past had been the reluctance of the traditional utilities to purchase excess power from, or sell backup power to, these nontraditional facilities. Section 210 of PURPA attempts to remove this obstacle by requiring that electric utilities purchase electrical energy from qualifying co-generating or small power production facilities (QFs) and provide back-up power to QFs on a nondiscriminatory basis.

Energy & Utilities Law > Regulators > US Federal Energy Regulatory Commission > General Overview

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Electric Power Industry > Electric Power Rates > General Overview

Energy & Utilities Law > Electric Power Industry > Electric Power Rates > Retail Rates

Energy & Utilities Law > Electric Power Industry > State Regulation > General Overview

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN2* Congress provides that the rates established by the U.S. Federal Energy Regulatory Commission for the purchases of electricity by a utility (1) shall be just and reasonable to the utility's customers, and (2) shall not discriminate against qualifying co-generating facilities. *16 U.S.C.S. § 824-3(b)*.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Electric Power Industry > State Regulation > General Overview

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN3* *16 U.S.C.S. § 824a-3(d)* provides that no rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy. The incremental cost of alternative electric energy is defined as the cost the utility would have incurred if it had generated itself or purchased from another utility the same amount of power it purchased from the qualifying co-generating facility (QF). *16 U.S.C.S. § 824a-3(d)*. By setting a ceiling of incremental cost on the amount a utility could be forced to pay for a QF's power, Congress intended to encourage cogeneration without requiring a utility's ratepayers to subsidize co-generators.

Energy & Utilities Law > Regulators > US Federal Energy Regulatory Commission > Authorities & Powers

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

*HN4* *18 C.F.R. § 292.304 (1990)* require that each electric utility purchase any energy and capacity which is made available from a qualifying co-generating facility.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Pipelines & Transportation > Pipelines > Rates

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN5* *18 C.F.R. § 292.304 (1990)* sets the rate of payment for such purchases equal to the utility's full avoided cost unless the state regulatory authority, or an unregulated utility, determines that a lower rate is in the public interest and is sufficient to encourage cogeneration.

Energy & Utilities Law > Regulators > US Federal Energy Regulatory Commission > Authorities & Powers

Energy & Utilities Law > ... > US Federal Energy Regulatory Commission > Civil Actions > Jurisdiction

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Cogeneration & Independent Companies > Public Utility Regulatory Policies Act > Compliance Enforcement

Energy & Utilities Law > Electric Power Industry > Electric Power Rates > Retail Rates

Energy & Utilities Law > Pipelines & Transportation > Pipelines > Rates

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN6* Nothing in *18 C.F.R. § 292.301(b)(1)* limits the authority of any electric utility or any qualifying co-generating facility to agree to a rate for any purchase which differs from the rate which would otherwise be required by this subpart.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Electric Power Industry > Electric Power Rates > General Overview

Energy & Utilities Law > Oil, Gas & Mineral Interests > Purchase Contracts > Price Terms

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN7* Rates for purchases from a qualifying facility. (1) Rates for purchases of energy and capacity from any qualifying facility shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against qualifying cogeneration and small power production facilities. (2) Rates for purchases of energy ad capacity from any qualifying facility shall not exceed avoided costs; however, in the case in which the rates for purchase are based upon estimates of avoided costs over the specific term of the contract or their legally enforceable obligation, the rates for such purchases do not violate this subsection if the rates for such purchases differ from avoided costs at the time of delivery. 16 Tex. Admin. Code § 23.66(e)(1), (2) (1988).

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Electric Power Industry > Electric Power Rates > General Overview

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN8* Rates for purchases satisfy the requirements of paragraph (1) of this subsection if they equal avoided cost.

(4) Rates for purchases from qualifying facilities shall be in accordance with paragraph (1)-(3) of this subsection, regardless of whether the electric utility making such purchases is simultaneously making sales to the qualifying facility. (5) Payments by a utility to any qualifying facility, if in accordance with paragraphs (1)-(3) of this subsection, shall be considered reasonable and necessary operating expenses by that utility. 16 Tex. Admin. Code § 23.66(e)(3)-(5) (1988).

Civil Procedure > ... > Eminent Domain Proceedings > Commissioners > Reports

Energy & Utilities Law > Regulators > Public Utility Commissions > Ratemaking Procedures

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Electric Power Industry >. State Regulation > General Overview

Energy & Utilities Law > Utility Companies > Ownership & Restructuring

*HN9* *Tex. Rev. Civ. Stat. Ann. art. 1446c, § 63* (Supp. 1991) requires public utilities to report to the Public Utility Commission (Commission) any sale of a plant when the total consideration exceeds $ 100,000. The Commission then must determine if the transaction is consistent with the public interest. If the Commission finds that the transaction is not in the public interest, the Commission shall take the effect of the transaction into consideration in the rate-making proceedings and shall disallow the effect of such transaction if it will unreasonably affect rates or service.

Administrative Law > Judicial Review > Standards of Review > General Overview

Administrative Law > Judicial Review > Standards of Review > Rule Interpretation

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Definition of Plain Error

Energy & Utilities Law > ... > Public Utility Commissions > Hearings & Orders > Judicial Review

Energy & Utilities Law > Utility Companies > General Overview

Environmental Law > Administrative Proceedings & Litigation > Judicial Review

*HN10* The Public Utility Commission's (Commission) interpretation of its own regulations is entitled to deference by the courts. The appellate court's review is limited to determining whether the administrative interpretation is plainly erroneous or inconsistent with the regulation. However, if the Commission has failed to follow the clear, unambiguous language of its own regulation, the court must reverse its action as arbitrary and capricious.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN11* The court reads 16 Tex. Admin. Code § 23.66(e) (1988) as operating solely to set the rates that the Public Utility Commission can compel a utility to pay for a qualifying co-generating facility's (QF) power if the utility and the QF are unable to reach a voluntary agreement. 16 Tex. Admin. Code § 23.66(e) does not impose a ceiling on the amount a utility can contract to pay for a QF's power, nor does it limit the amount a utility can recover from its ratepayers under such voluntary arrangements.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN12* 16 Tex. Admin. Code § 23.66(e) (1988) avoided-cost rules therefore do not apply to voluntary contracts arranged outside the requirements of 16 Tex. Admin. Code § 23.66(d). This interpretation of subsections (d) and (e) is in harmony with the plain language of 16 Tex. Admin. Code § 23.66(b), which permits a utility and a qualifying co-generating facility to agree to a rate which differs from the rate that would otherwise be required whether above, below, or equal to avoided cost.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Oil, Gas & Mineral Interests > Purchase Contracts > Price Terms

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN13* Because 16 Tex. Admin. Code § 23.66(e) (1988) does not apply to contractual arrangements between utilities and qualifying co-generating facilities, it does not impose any limitation on the amount a utility can recover from its customers for such contractual payments.

Energy & Utilities Law > Regulators > Public Utility Commissions > Authorities & Powers

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Electric Power Industry > State Regulation > General Overview

Energy & Utilities Law > Utility Companies > General Overview

*HN14* The court holds that the federal regulations do not grant the Texas Public Utility Commission any more authority to regulate negotiated purchases than do the state regulations.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Pipelines & Transportation > Pipelines > Rates

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN15* _18 C.F.R. § 292.303(a) (1990)_ provides that a utility is obligated to purchase any energy and capacity made available from a qualifying co-generating facility. Such purchases must be made in accordance with _18 C.F. R. § 292.304_, which sets the rate for purchases at avoided cost. Because _§ 292.304_ is applied through _§ 292.303_, the avoided-cost limit applies only to compelled purchases.

Administrative Law > Judicial Review > Standards of Review > Substantial Evidence

*HN16* The appellate court's inquiry is whether the Public Utility Commission's decision is reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole.

Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Standard of Review

Administrative Law > Judicial Review > Standards of Review > Substantial Evidence

*HN17* Agency decisions that are not supported by substantial evidence are deemed arbitrary and capricious.

Administrative Law > Judicial Review > Standards of Review > Substantial Evidence

*HN18* In applying the substantial evidence test, the appellate court may not, however, substitute its judgment as to the weight of the evidence for that of the agency.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN19* The issue of the proper allocation of proceeds from the sale of assets is a complicated one that cannot be resolved simply by reference to who paid for the property.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Utility Companies > Rates > General Overview

*HN20* A proper allocation of proceeds from the sale of assets can be determined only by an analysis of all the equities involved.

Energy & Utilities Law > Cogeneration & Independent Companies > General Overview

Energy & Utilities Law > Utility Companies > Rates > General Overview

Energy & Utilities Law > ... > Rates > Ratemaking Factors > Rate Base

*HN21* The equitable principles commonly used to resolve allocation problems are that benefits should follow burdens and that gain should follow risk of loss. In other words, in the general case, the gain should be allocated to

that group, as between shareholders and ratepayers, that has borne the financial burdens and risks of the asset sold. In addition to these two general equitable factors, courts have also considered numerous other factors, including whether the asset sold had been included in the rate base over the years, whether the asset was depreciable property, nondepreciable property, or a combination of the two types, the impact of the proposed allocation on the financial strength of the utility, the reason for the asset's appreciation, any advantages enjoyed by the shareholders because of favored treatment accorded the asset, the dividends paid out to the shareholders over the years, and any extraordinary burdens borne by the ratepayers in connection with that asset.

**Counsel:** The Honorable Dan Morales, Attorney General of Texas, Ms. Susan D. Bergen, Office of Attorney General of Texas, Dan Morales, A. G., Ms. C. Kingsbery Ottmers, Office of Public Utility Counsel, Mr. John L. Laakso, Assistant Public Counsel, Office of Public Utility Counsel, Austin, Texas, for Petitioners.

Mr. Barry Bishop, Clark, Thomas, Winters & Newton, Mr. John F. Williams, Clark, Thomas, Winters & Newton, Austin, Texas, for Respondent.

**Judges:** Thomas R. Phillips, C.J. Concurring and dissenting opinion by Justice Raul A. Gonzalez and Oscar H. Mauzy JJ.

**Opinion by: PHILLIPS**

| Opinion |
| --- |

[*202] _OPINION_

This case is an administrative appeal from a final order of the Texas Public Utility Commission. Gulf States Utilities Company (GSU) sought the Commission's approval of the sale of two of GSU's generating units and of GSU's proposed rate treatment of certain revenues and expenses associated with that transaction. GSU proposed to sell the two plants to a joint venture comprised of GSU and three of its Louisiana industrial customers; GSU then planned to purchase the entire electrical output [**2] from the plants for distribution to its customers. GSU requested the Commission to rule that, in future rate proceedings, it be allowed to recover from its ratepayers its total purchase price for the electricity and furthermore that it be allowed to allocate the proceeds from the sale of the depreciated plants to its shareholders rather than to its ratepayers.

The Commission concluded that the proposed sale was generally in the public interest but imposed two conditions on GSU's treatment of the transaction in future rate proceedings. First, the Commission determined that it was

not in the public interest for GSU's ratepayers "to pay in excess of GSU's avoided cost" for power purchased from the joint venture. Therefore, the Commission held that it would not allow GSU to recover from its Texas ratepayers payments for electricity from the joint venture in excess of GSU's avoided cost. Second, the Commission determined that GSU must divide the proceeds from the sale of the plants between the ratepayers and its shareholders in proportion to the amount each group contributed to the cost of the plants.

The district court affirmed the Commission's order. The court of appeals then reversed [**3] the judgment of the district court and remanded the case to the _Commission. 784 S.W.2d 519_. The Commission and the Office of Public Utility Counsel now appeal to this court. We must first determine whether the applicable state and federal regulations permit a utility purchasing power from a cogenerator to recover from its ratepayers payments in excess of its avoided cost. Second, we must determine whether the Commission's allocation of the utility's proceeds from the sale of its plants was proper. For the reasons that follow, we affirm the judgment of the court of appeals.

I

A

In 1978, in response to rising energy costs and recent fuel shortages, Congress sought ways to conserve energy to reduce [*203] the nation's dependence on foreign oil and on natural gas. _See Federal Energy Regulatory Comm'n v. Mississippi, 456 U.S. 742, 745-46, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532, 538 (1982)_. One possible remedy was to increase the use of cogeneration. Cogeneration involves the simultaneous production of electrical power and thermal energy, such as heat or steam, usually at an industrial site. _Id. at 750_ & n.11, _102 S.Ct. at 2132_ & n.11, _72 L.Ed.2d at 541_ & n.11. By making [**4] productive use of the "waste" heat produced in the generation of electricity, cogeneration can reduce fuel consumption by as much as one half. _See_ C. PHILLIPS, THE REGULATION OF PUBLIC UTILITIES: THEORY AND PRACTICE 452 n.92 (1988); _see also_ 45 Fed. Reg. 12,215 (1980).

_HN1_ To encourage cogeneration, Congress enacted section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA). Pub. L. No. 95-617,92 Stat. 3117 (1978) (codified as amended at _16 U.S.C. § 824a-3 (1988)_). An obstacle to the development of cogeneration facilities in the past had been the reluctance of the traditional utilities to purchase excess power from, or sell backup power to, these nontraditional facilities. _FERC v. Mississippi, 456 U.S. at 750-51, 102 S.Ct. at 2132-33, 72 L.Ed.2d at 541_. Section 210 of PURPA attempts to remove this obstacle by requiring that electric utilities purchase electrical energy from qualifying cogenerating or small power production facilities [1] [**5] (QFs) and provide back-up power to QFs on a nondiscriminatory basis. [2]

In section 210, Congress directed the Federal Energy Regulatory Commission (FERC) to prescribe, within one year of the statute's enactment, rules requiring electric utilities to purchase power from and sell power to QFs. PURPA § 210(a), _16 U.S.C. § 824-3(a) (1988)_. _HN2_ Congress further provided that the rates established by FERC for the purchases of electricity by a utility (1) shall be just and reasonable to the utility's customers, and (2) shall not discriminate against QFs. PURPA § 210(b), _16 U.S.C. § 824-3(b) (1988)_. _HN3_ Section 210(b) also provides that "no .... rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the [**6] incremental cost to the electric utility of alternative electric energy." _Id._ The "incremental cost of alternative electric energy" is defined as the cost the utility would have incurred if it had generated itself or purchased from another utility the same amount of power it purchased from the QF. PURPA § 210(d), _16 U.S.C. § 824a-3(d) (1988)_. By setting a ceiling of incremental cost on the amount a utility could be forced to pay for a QF's power, Congress intended to encourage cogeneration without requiring a utility's ratepayers to subsidize cogenerators. H.R. CONF. REP. NO. 1750, 95th Cong., 2d Sess. 98, reprinted in 1978 U.S. CODE CONG & ADMIN. NEWS 7797, 7832.

Pursuant to this statutory authority, FERC has adopted regulations governing an electric utility's purchases from QFs. _See 18 C.F.R. pt. 292 (1990)_. _HN4_ The regulations require that each electric utility "purchase, in accordance with § 292.304, any energy and capacity which is made available from a qualifying facility." _Id. § 292.303_. _HN5 Section 292.304_ sets the rate of payment for such purchases equal to the utility's full avoided cost unless the state regulatory authority (or an unregulated utility)

---

[1] Small power production facilities are those which use biomass, waste, geothermal resources, or renewable resources such as wind, water, or solar energy to produce electrical power.

[2] A further obstacle to cogeneration had been the risk that a cogenerator would be considered a public utility and thus be subject to burdensome state and federal regulation. _FERC v. Mississippi, 456 U.S. at 750-51, 102 S.Ct. at 2133, 72 L.Ed.2d at 541_. PURPA directs FERC to prescribe rules exempting QFs from certain state and federal laws governing conventional electric utilities. PURPA § 210(e), _16 U.S.C. § 824a-3(e) (1988)_.

determines [**7] that a lower rate is in the public interest and is sufficient to encourage cogeneration. *Id.§ 292.304(b)(2)*. (The term "full avoided cost" is equivalent to PURPA's "incremental cost.") Finally, the regulations provide that *"HN6* nothing in this subpart . . . limits the authority of any electric utility or any [QF] to agree to [*204] a rate for any purchase . . . which differs from the rate . . . which would otherwise be required by this subpart." *Id.§ 292.301(b)(1)*.

Because Congress intended that state regulatory authorities be the primary enforcers of PURPA, section 210(f) of PURPA orders each state regulatory authority to implement FERC's rules. [3] [**10] *16 U.S.C. § 824-3(f) (1988)*. In 1981, the Texas legislature added a provision to the Texas Public Utility Regulatory Act (Texas PURA) to the effect that the Commission "shall make and enforce rules reasonably required to implement the rules and regulations of the Federal Energy Regulatory Commission pertaining to the production of electric energy by [QFs]." Act of Apr. 1, 1981, 67th Leg., R.S., ch. 31, § 2, 1981 Tex. Gen. Laws 70, 71. This provision was later amended to order the Commission to "make and enforce rules [**8] to encourage the economical production of electrical energy by [QFs]." Act of May 26, 1983, 68th Leg., R.S., ch. 274, § 1, 1983 Tex. Gen. Laws 1258, 1280 (codified at *TEX. REV. CIV. STAT. ANN. art. 1446c, § 16(g)* (Vernon Supp. 1991)). Pursuant to these directives, the Commission has enacted its own rules governing a utility's purchases of power from a QF. Tex. Pub. Util. Comm'n, 16 TEX. ADMIN. CODE § 23.66 (West Sept. 1, 1988) ("Rule 23.66").

The Texas rules apply to FERC-certified QFs, *id.* § 23.66(a)(15), and are very similar to FERC's rules. Rule 23.66(d) of the Texas rules provides that "in accordance with subsections (e) - (h) of this section, each electric utility shall purchase any energy and capacity that is made available from a qualifying facility . . . ." *Id.* § 23.66(d)(1)(A). Rule 23.66(e) requires that rates for such purchases "shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against" QFs. *Id.* § 23.66(e)(1). The rates "shall not exceed avoided cost." *Id.* § 23.66(e)(2). "Avoided cost" has the same meaning as in FERC's regulations. *Id.* § 23.66(a)(2). Rates which equal [**9] avoided cost are deemed to be just and reasonable, *id.* § 23.66(e)(3), and such payments are considered "reasonable and necessary operating expenses of [the] utility." *Id.* § 23.66(e)(5). [4] Finally, as in FERC's rules, the Texas rules provide that nothing in the rules "shall limit the authority of any electric utility or any qualifying facility to agree to a rate for any [*205] purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions that would otherwise be required by this subsection." *Id.* § 23.66(b)(2)(A).

---

[3] The U.S. Supreme Court has held that the federal government may constitutionally order the states to implement FERC's regulations through state courts or agencies. *FERC v. Mississippi, 456 U.S. at 760-61, 102 S.Ct. at 2138, 72 L.Ed.2d at 547-48*. Under this federal command, states have the authority to promulgate regulations mirroring the federal regulations. 45 Fed. Reg. 12,216 (1980). However, it is unclear whether, under PURPA, a state may promulgate additional regulations in the field of cogeneration. In general, a state may enact its own laws or regulations as long as the federal authority has not preempted all state efforts to regulate in the area and as long as the state laws or regulations do not conflict with federal laws or regulations. *City of New York v. FCC, 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48, 57 (1988)*. Whether PURPA and the FERC regulations completely preempt state regulation in the area of cogeneration is an open question. The issue of preemption is discussed at *infra* note 11.

[4] In full, Rule 23.66(e) provides:

*HN7* (e) Rates for purchases from a qualifying facility.

(1) Rates for purchases of energy and capacity from any qualifying facility shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against qualifying cogeneration and small power production facilities.

(2) Rates for purchases of energy ad capacity from any qualifying facility shall not exceed avoided costs; however, in the case in which the rates for purchase are based upon estimates of avoided costs over the specific term of the contract or their legally enforceable obligation, the rates for such purchases do not violate this subsection if the rates for such purchases differ from avoided costs at the time of delivery.

*HN8* (3) Rates for purchases satisfy the requirements of paragraph (1) of this subsection if they equal avoided cost.

(4) Rates for purchases from qualifying facilities shall be in accordance with paragraph (1)-(3) of this subsection, regardless of whether the electric utility making such purchases is simultaneously making sales to the qualifying facility.

(5) Payments by a utility to any qualifying facility, if in accordance with paragraphs (1)-(3) of this subsection, shall be considered reasonable and necessary operating expenses by that utility.

16 TEX. ADMIN. CODE § 23.66(e) (West Sept. 1, 1988).

[**11] The first issue we must address in this case concerns the proper interpretation of the above federal and state regulations governing a utility's purchases of electricity from a QF. The questions presented are (1) whether the regulations prohibit a utility from contracting for and paying a rate *in excess of its avoided cost* and (2) whether, if a utility may pay more than avoided cost, the regulations impose a limitation on how much of these payments the utility can recover from its ratepayers. The controversy arises because both sets of regulations expressly allow a utility and a QF to agree to any rate for purchased power, see *18 C.F.R. § 292.301(b)(1) (1990)*; 16 TEX. ADMIN. CODE § 23.66(b)(2)(A) (West Sept. 1, 1988), but in subsequent provisions limit purchased power payments to avoided cost. *See 18 C.F.R. § 292.304(a)(2) (1990)*; 16 TEX. ADMIN. CODE § 23.66(e)(2) (West Sept. 1, 1988).

B

We consider these questions in light of the circumstances presented by this case. GSU is a public electric utility located in Texas near the Louisiana border. In 1984, two of GSU's largest industrial customers, both situated in Louisiana, notified GSU that they were planning to build [**12] a cogeneration facility, which would enable them eventually to withdraw from GSU's system. [5] Normally, the loss of such major customers from GSU's system would result in increases in the rates paid by the remaining customers. These increases would occur because the utility's fixed costs would have to be spread over a smaller number of ratepayers. As a way to keep the industrial customers in its system and thereby to prevent such rate increases, GSU proposed the formation of a joint cogeneration venture with the customers.

GSU and three of its Louisiana-based industrial customers eventually entered into an agreement to form the Nelson Industrial Steam Company Project (the Venture). Under the terms of this agreement, GSU agreed to sell two of its electrical generating plants to the Venture and to run the plants on behalf of the Venture. [6] GSU further [**13] agreed to purchase the entire electric output from the plants for its general power supply at a price calculated by a contractual formula. [7] In return for GSU's undertakings, the three industrial members of the Venture agreed to continue as GSU's customers. FERC later certified the

Venture as a QF, contingent on the Venture's reaching certain milestones in converting the plants from natural gas to petroleum coke operation.

Completion of the agreement to form the Venture was made contingent on the Commission's [**14] approval of GSU's proposed rate treatment of certain revenues and expenses arising out of the sale. GSU requested such approval under section 63 of the Texas PURA. *HN9* This section requires public utilities to report to the Commission any sale of a plant when the total consideration exceeds $ 100,000. The Commission then must determine if the transaction "is consistent with the public interest." *TEX. REV. CIV. STAT. ANN. art. 1446c, § 63* (Vernon Supp. 1991). If the Commission finds that the transaction is not in the public interest, the Commission "shall take the effect of the transaction into consideration in the rate-making proceedings" and "shall ... disallow the effect of such transaction if it will unreasonably affect rates or service." *Id.*

[*206] Section 63 does not require a utility to obtain the Commission's approval prior to such sales. Furthermore, the Commission does not set electric utility rates in a section 63 proceeding. Nevertheless, the Commission must determine the effect of a transaction on future ratemaking proceedings in order to determine whether the transaction as proposed will be in the public interest. In their section 63 application, therefore, the [**15] parties to the Venture requested a prospective ruling on the future rate treatment that would be granted the transaction. Specifically, GSU requested a ruling from the Commission that GSU be allowed to pass on the full amount of its payments to the Venture for electricity (the purchased power payments) to its ratepayers and that it be allowed to allocate the entire proceeds from the sale of the plant to its shareholders.

After a hearing, the Hearing Examiner determined that the sale of the plants to the Venture was generally in the public interest. The Examiner then found that GSU's purchased power payments might at times exceed GSU's avoided cost. The Examiner determined that avoided cost was the maximum rate that would be deemed just and reasonable and in the public interest under Rule 23.66(e). However, she concluded that GSU should be allowed to seek recovery of any purchased power payments in excess of its

---

[5] The customers' desire to withdraw was motivated in part by rate increases produced by an expensive nuclear power plant that GSU had recently brought on line.

[6] GSU would have a 1% interest in the Venture.

[7] The contractual formula is based on the current Louisiana tariff for large industrial customers and on the Venture's production costs, rather than on GSU's avoided cost. Depending on the values for the factors in the formula, the purchased power rate may be less than or greater than avoided cost. If the rate exceeds avoided cost, the industrial customers are required to purchase additional amounts of electricity to partially offset GSU's increased cost.

Giana Ortiz

avoided cost in future rate or fuel-reconciliation proceedings. [8] In order to recover the payments, GSU would have to show that the

costs were necessary as a means to keep its industrial load on the system, that the ratepayers benefited by the retention of the industrial [**16] load on the system, that the costs in excess of avoided costs were at a minimum, and that given these circumstances, its fuel costs were at their lowest reasonable level.

Tex. Pub. Util. Comm'n, *Application of Gulf States Utils. Co. for Approval of a Joint Venture Cogeneration Project and Treatment of Revenues,* Docket No. 7147, 14 TEX. P.U.C. BULL. 49, 66-67 (Mar. 21, 1988) [hereinafter Docket No. 7147]. The Examiner further determined that it would be unreasonable for the ratepayers to absorb all the costs associated with the purchased power payments. As to the allocation of the sale proceeds, the Examiner concluded that the ratepayers should be credited with 83 percent of the proceeds because they paid for 83 percent of the cost of the plants. The ratepayers' 83 percent share of the proceeds would be deemed "other electric utility income" and would be used to offset the amount of revenue otherwise required to be generated by the rates.

[**17] The Commission's final order deleted the Hearing Examiner's findings that GSU could seek recovery of the full amount of its purchased power payments and substituted findings that GSU could *not* recover anything above avoided cost. The final order thus stated that "it is not in the public interest for GSU's Texas ratepayers to pay in excess of GSU's avoided cost for purchased power from a qualifying cogeneration project" and that "in future rate proceedings, [GSU] is limited to recovering those purchased power payments to the Venture that do not exceed GSU's avoided costs." [9] Docket No. 7147, supra p. 10, at 98. The parties to the Venture later went ahead with the transaction despite the Commission's disallowance of the requested rate treatment.

GSU appealed to the district court, which affirmed the Commission's order. GSU then appealed to the court of appeals, which reversed the judgment of [**18] the district court and remanded to the Commission. The court of appeals held that the Commission's interpretation of Rule 23.66 as imposing a ceiling on negotiated purchased power payments was unreasonable under the text of the provision and contrary to the provisions and purposes of the Texas [*207] PURA. 784 S.W.2d at 528. The court of appeals also held that the Commission's allocation of the

sale proceeds was not supported by substantial evidence in the record. *784 S.W.2d at 533.*

II

We first address that part of the Commission's order holding that GSU cannot recover from its ratepayers purchased power payments in excess of avoided cost. The Commission's ruling is based on its interpretation of the state regulations, in particular Rule 23.66. As described above, Rule 23.66(b)(2)(A) allows utilities and QFs to agree to *any* rate, while Rule 23.66(e) states that purchases of energy from QFs shall not exceed avoided cost. Thus, the two rules appear to conflict. The Commission attempts to harmonize the two rules by interpreting them to permit a utility and a QF to contract only for rates below avoided cost. The Commission also argues that, even if Rule 23.66(b) allows a utility [**19] to pay a rate above avoided cost, Rule 23.66(e) prohibits a utility from recovering from its ratepayers any payments, whether negotiated or compelled, in excess of avoided cost. According to the Commission, Rule 23.66(e) provides that only those payments that are equal to avoided cost are just, reasonable, and in the public interest. Therefore, it is not just, reasonable, or in the public interest for the ratepayers to pay more than avoided cost under any circumstances. Finally, the Commission argues that FERC's regulations also place a limit of avoided cost on purchased power payments.

*HN10* The Commission's interpretation of its own regulations is entitled to deference by the courts. *See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965); Lloyd A. Fry Roofing Co. v. State, 541 S.W.2d 639, 644 (Tex. Civ. App. -- Dallas 1976, writ ref'd n.r.e.).* Our review is limited to determining whether the administrative interpretation "is plainly erroneous or inconsistent with the regulation." *United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48, 56 (1977)* (quoting *Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct.* [**20] *1215, 1217, 89 L.Ed. 1700, 1702 (1945)).* However, if the Commission has failed to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious. *See Sam Houston Elec. Coop., Inc. v. Public Util. Comm'n, 733 S.W.2d 905, 913 (Tex. App. -- Austin 1987, writ den'd); see also Lewis v. Jacksonville Bldg. &*

---

[8] At reconciliation proceedings, a utility's fuel costs over a period are reconciled with the projected costs for that period and a credit or charge is assessed to the ratepayers accordingly. *See* 16 TEX. ADMIN. CODE § 23.23(b)(2)(H) (West Sept. 1, 1988).

[9] One of the Commissioners dissented from the part of the final order limiting GSU's recovery to avoided cost.

*Loan Ass'n, 540 S.W.2d 307, 310 (Tex. 1976), and Ex parte Roloff, 510 S.W.2d 913, 915 (Tex. 1974).* [10]

We hold that the Commission acted arbitrarily in adopting an interpretation contrary to the [**21] plain language of its regulation. Rules 23.66(b)(2)(A) and 23.66(e) can be harmonized, but not in the manner suggested by the Commission. *HN11* We read Rule 23.66(e) as operating solely to set the rates that the Commission can *compel* a utility to pay for a QF's power if the utility and the QF are unable to reach a voluntary agreement. Rule 23.66(e) does not impose a ceiling on the amount a utility can *contract* to pay for a QF's power, nor does it limit the amount a utility can recover from its ratepayers under such voluntary arrangements.

Our interpretation is based on the interaction between Rule 23.66(e) and Rules 23.66(d) and 23.66(b). Rule 23.66(d) obligates a utility to purchase power from a QF if the QF makes such power available. Subsection (d) also provides that the rates for purchases made under that subsection are governed by Rule 23.66(e). *See* 16 TEX. ADMIN. CODE § 23.66(d)(1)(A) (West Sept. 1, 1988) ("In accordance with subsection[] (e) . . . of this section, each electric utility shall purchase any energy and capacity that is made available from a [QF] . . . ."). *HN12* Rule 23.66(e)'s avoided-cost rules therefore do [*208] not apply to voluntary contracts arranged [**22] outside the requirements of Rule 23.66(d). This interpretation of subsections (d) and (e) is in harmony with the plain language of Rule 23.66(b), which permits a utility and a QF "to agree to a rate which differs from the rate that would otherwise be required" whether *above, below, or equal to* avoided cost. We find no justification in the language of Rule 23.66(b) to support the Commission's

interpretation that subsection (b) allows a utility to contract for any price *below* avoided cost but not for a price *above* avoided cost. Finally, *HN13* because Rule 23.66(e) does not apply to contractual arrangements between utilities and QFs, it does not impose any limitation on the amount a utility can recover from its customers for such contractual payments. The provision that payments equal to avoided cost "shall be considered reasonable and necessary operating expenses of that utility" merely ensures that a utility can recover the full amount of the payments it is *compelled* to make by the Commission. Subsection (e)(5) does not provide that contractual payments above avoided cost can *never* be considered reasonable and necessary operating expenses of the utility.

We must also [**23] consider the application of PURPA and the federal regulations because the transaction between GSU and the Venture is governed by federal law as well as by Texas law. The interstate activities of GSU clearly bring it within the reach of the federal regulations. *FERC v. Mississippi, 456 U.S. 742, 757, 102 S.Ct. 2126, 2136, 72 L.Ed.2d 532, 545 (1982).* In addition, to the extent that the state regulations implement PURPA, the federal regulations serve as a guideline to and may control the scope of the state regulations.

*HN14* We hold that the federal regulations do not grant the Commission any more authority to regulate negotiated purchases than do the state regulations. [11] [**26] Like the Texas regulations, the federal regulations do not authorize the Commission to alter the terms of a purchased power contract between a utility and a QF. Neither do they set a limit of avoided cost on the amount of such payments a utility can recover from its ratepayers. Thus, *HN15* *section*

---

[10] The standard for reviewing the Commission's interpretation of its regulations that were promulgated to implement *federal* law, as well as for reviewing the Commission's interpretation of *federal* regulations, might well be less deferential. However, in the absence of any requests from the parties to use a different standard, we apply the deferential standard enunciated in the text to all of the Commission's interpretations in the present case.

[11] Because we find that the federal and state regulations are identical in this regard, we do not reach the issue of whether the federal law preempts state regulation in the area of cogeneration. To the extent that the Texas regulations imposed different requirements than did the federal regulations, it would be necessary to determine whether the federal law preempted Texas regulation. The answer is unclear. As discussed *supra* note 3, PURPA directs states to implement FERC's rules; however, neither PURPA nor the federal regulations expressly state whether additional state regulation is preempted.

The preemption issue has previously arisen in situations where states have tried to impose a compelled rate that is higher than FERC's avoided cost ceiling. FERC originally stated that "the States are free . . . to enact laws or regulations providing for rates which would result in even greater encouragement of these technologies," i.e., rates above avoided cost. 45 Fed. Reg. 12,221 (1980). In 1988, FERC proposed changes to the regulations that would prohibit states from setting a compelled rate higher than avoided cost. 53 Fed. Reg. 9331 (1988); *see Occidental Chem. Corp. v. FERC, 869 F.2d 127, 128 (2d Cir. 1989).* These changes are still pending. Prior to these recent developments, the lower federal courts had disagreed on whether PURPA preempts state regulations that set a price above avoided cost. *Compare Consolidated Edison Co. v. Public Serv. Comm'n, 63 N.Y.2d 424, 436 n.8, 483 N.Y.S.2d 153, 157 n.8, 472 N.E.2d 981, 985 n.8 (1984)with Kansas City Power & Light Co. v. State Corp. Comm'n, 234 Kan. 1052, 1057-58, 676 P.2d 764, 767-68 (1984).* The Supreme Court has declined to address the issue. *See Consolidated Edison Co. v. Public Serv. Comm'n, 470 U.S. 1075, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985)* (dismissing the appeal from the Court of Appeals of New York for want of a substantial federal question).

292.303(a) of the federal regulations provides that a utility is obligated to purchase any energy and capacity made available from a QF. Such purchases must be made in accordance with section 292.304, which sets the rate for purchases [**24] at avoided cost. Because section 292.304 is applied through section 292.303, the avoided-cost limit applies only to compelled purchases. This interpretation of sections 292.303 and 292.304 is in harmony with the language of section 292.301(b)(1), which provides that nothing is to limit the authority of a utility or QF "to agree to a rate for any purchase . . . which differs from the rate . . . which would otherwise be required by this subpart." [12] [*209] 18 C.F.R. § 292.301(b)(1) (1990). See American Paper Inst., Inc. v. American Elec. Power Serv. Corp., 461 U.S. 402, 416, 103 S.Ct. 1921, 1930, 76 L.Ed.2d 22, 35 (1983) ("The Commission's [full-avoided-cost] rule simply establishes the rate that applies in the absence of a waiver or a specific contractual agreement."); [13]see also In re Vicon Recovery Sys., 153 Vt. 539, 572 A.2d 1355, 1358 (1990) ("The rate provisions of § 292 apply only . . . in a situation where the electric utility is forced to purchase power from the small producer. The regulations make clear that utilities and [QFs] can agree to a rate different than would otherwise be mandated."); Barasch v. Public Util. Comm'n, 119 Pa. Commw. 81, [**25] 546 A.2d 1296, 1300 (Pa. Commw. Ct.) ("privately negotiated contracts setting rates for QF power are essentially outside the federal and state rules"), modified, 550 A.2d 257 (Pa. Commw. Ct. 1988) (holding

that previous opinion was to have prospective effect only); Bates Fabrics Inc. v. Public Utils. Comm'n, 447 A.2d 1211, 1214 (Me. 1982) ("We conclude that the federal scheme expressly excludes from its reach all otherwise binding contracts between utilities and" QFs.). Finally, the regulations say nothing about how much of its purchased power payments a utility can recover from its ratepayers.

[**27] Our holding that the state and federal regulations governing a utility's purchases of power from a QF do not apply to voluntary arrangements between a utility and a QF does not deprive the Commission of its regulatory authority over the amount of such contractual payments that a utility may recover from its customers. GSU may contract for any purchase price it wishes; however, whether such cost will be fully recoverable from the ratepayers will be subject to the Commission's ordinary ratemaking powers. GSU's purchase of electricity from the Venture is a fuel cost, see 16 TEX. ADMIN. CODE § 23.23(b)(2)(B) (West Sept. 1, 1988), which, like any other expense, is subject to disallowance by the Commission upon a finding that the expense is unreasonable, unnecessary, or not in the public interest. [14]SeeTEX. REV. CIV. STAT. ANN. art. 1446c, §§ 38, 39(a), 41(c)(3)(D) (Vernon Supp. 1991); [15] 16 TEX. [*210] ADMIN. CODE § 23.23(b) (West Sept. 1, 1988) (utility must show that contract negotiations for purchased power have produced the lowest reasonable cost of fuel to ratepayers); see also Suburban Util. Corp. v. Public Util. Comm'n, 652 S.W.2d

---

[12]  FERC's comments accompanying the federal regulations adopt this interpretation:

Paragraph (b)(1) [allowing utilities and QFs to agree to any rate] reflects the Commission's view that the rate provisions of section 210 of PURPA apply only if a [QF] chases to avail itself of that section. Agreements between an electric utility and a [QF] for purchases at rates different than rates required by these rules . . . do not violate the Commission's rules under section 210 of PURPA. The Commission recognizes that the ability of a [QF] to negotiate with an electric utility is buttressed by the existence of the rights and protections of these rules.

45 Fed. Reg. 12,217 (1980).

[13]  We disagree with the Commission's interpretation of the Supreme Court's comment that "a qualifying facility and a utility may negotiate a contract setting a price that is lower than a full avoided cost rate." American Paper Inst., 461 U.S. at 416, 103 S.Ct. at 1930, 76 L.Ed.2d at 35. We do not read this statement to mean that a utility may not negotiate for a price above avoided cost because the Court was not asked to consider the status of prices above avoided cost.

[14]  Allowing the Commission to examine the fairness and reasonableness of GSU's payments to the Venture will not result in the improper application of ratemaking principles to cogenerators, as the Commission warns. Congress intended that cogenerators not be subject to the "type of examination that is traditionally given to electric utility rate applications to determine what is the just ad reasonable rate that they should receive for their electric power." H.R. CONF. REP. No. 1750, 95th Cong., 2d Sess. 97, reprinted in 1978 U.S. CODE CONG. & ADMIN. NEWS 7797, 7831. However, the Commissioner's task in this case is to analyze the purchased power rate in terms of its fairness to GSU's ratepayers, not its fairness to the Venture, and the former inquiry will not involve application of ratemaking principles to the Venture.

[15]  We do not agree with the court of appeals that Texas PURA section 41A is applicable here. Under section 41A, a voluntary purchased power agreement between a utility and a QF may be certified by the Commission if "the payments provided for in the agreement over the contract term are equal to or less than the utility's avoided costs as established by the commission and in effect at the time the agreement was signed . . . ." Once certified, the payments under the agreement are presumed to be reasonable and necessary expenses of the utility in any future rate proceedings. In the present case, however, section 41A does not apply because GSU has not requested section 41A certification. Furthermore, we do not think this specific certification procedure was meant to deprive a utility of its Rule 23.66(b) power to contract for a rate above avoided cost.

Giana Ortiz

*358, 362 (Tex. 1983)* ("The [**28] PUC's ratemaking power includes the discretion to disallow improper expenses."). In fact, section 63, under which this proceeding was brought, expressly orders the Commission to disallow any effect of the transaction that will unreasonably affect rates.

[**29] The Commission suggests that it would never be fair to the ratepayers for a utility to pay in excess of its avoided costs for power since *by definition* the utility could obtain the same amount of power elsewhere by paying avoided cost. But using this argument to set an absolute ceiling on purchased power payments ignores the plain language of the Commission's own rules, which do not authorize the Commission to impose a ceiling of avoided cost on such payments. Under the rules, the Commission must conduct an *independent, factual* inquiry in each case to determine whether payments in excess of avoided cost are reasonable and necessary, considering the effects of the transaction as a whole. [16]

[**30] Because the Commission was not called upon to set rates in the section 63 proceeding from which this case arose, we do not remand this part of the case to the Commission. Instead, we order the Commission to allow GSU to recover purchased power payments in excess of its avoided cost in future rate proceedings if GSU establishes to the Commission's satisfaction that the payments are reasonable and necessary expenses. The Commission contends that, since GSU and the industrial customers have already gone ahead with the Venture, GSU can no longer justify the payments on the grounds that they are necessary to retain the customers in the system. However, we believe that it may still be possible for GSU to establish the necessity of the Venture and the contractual rates. GSU should be allowed to show that, absent the Venture, the industrial customers would have left its system because independent cogeneration was economically more attractive than remaining in the system, that the contractual rates are necessary to make the Venture more attractive the independent cogeneration, and that such rates are at the minimum level. If GSU is able to satisfy the Commission that payments above avoided [**31] cost are justified, then the Commission should determine what portion of the costs of the Venture it is reasonable and necessary for the ratepayers to bear, given the distribution of benefits from the Venture to the ratepayers and to the shareholders. [17]

III

The second issue we must resolve is whether the Commission properly allocated the gains from the sale of the plants between GSU's ratepayers and its shareholders. Under the agreement, the Venture is to pay for the plants in twenty annual installments of $ 6.35 million each (the fixed asset payments), for a total income stream of $ 127 million. GSU requested that it be allowed to allocate the entire amount of each fixed asset payment, i.e., the entire proceeds of the sale, to its shareholders. [**32] The Commission instead ordered that GSU allocate 83 percent of each fixed asset payment, or 83 percent of the total sale proceeds, to its ratepayers, thereby reducing the amount the utility was entitled to recover through its rates by that amount.

We must reverse the Commission's allocation of the profits if it is not [*211] reasonably supported by substantial evidence in the record or if the Commission's action was arbitrary, capricious, or an abuse of discretion. Administrative Procedure and Texas Register Act, *TEX. REV. CIV. STAT. ANN. art. 6252-13a, § 19(e)(5), (6)* (Vernon Supp. 1991); *Railroad Comm'n v. Continental Bus Sys., 616 S.W.2d 179, 181 (Tex. 1981).* HN16 Our inquiry is whether the Commission's decision is reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole. *Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984).* HN17 Agency decisions that are not supported by substantial evidence are deemed arbitrary and capricious. *Id. at 454.* HN18 In applying this test, we may not, however, substitute our judgment as to the weight of the evidence for that of the agency. [**33] *Id. at 452.*

The Commission's decision to allocate 83 percent of the fixed asset payments to the ratepayers is based on the testimony of the Office of Public Utility Counsel's witness Dr. Steven Anderson and of the Commission's staff accountant Paul Bellon. GSU has indirectly recovered 83 percent of the cost of the plants from the ratepayers through depreciation expense allowed for the plants and figured into the rate base. Both Anderson and Bellon testified that "because the Company and the shareholders have recovered 83 percent of the costs related to [the

---

[16] We reject the Office of Public Utility Counsel's alternative argument that the Commission's holding was based on its independent determination that, on the facts of this case, payments in excess of avoided cost were unreasonable expenses under the general standards for allowability of expenses or fuel costs. It is clear from the Commission's Final Order, as well as from the Commission's own position in this appeal, that the Commission's interpretation of Rule 23.66 formed the only basis for its decision.

[17] In conducting this latter inquiry, the Commission should consider the benefits accruing to GSU's shareholders because of GSU's 1% share in the Venture, as well as any other income earned by GSU as a result of its operation of the plants on behalf of the Venture.

generating facilities], the ratepayers should receive 83 percent of the fixed asset payment GSU receives from the sale of the units." Docket No. 7147, *supra p. 10, at 56.*

We hold that the Commission's decision is not reasonably supported by substantial evidence in the record. The Commission based its decision solely on conclusory testimony that cites only the evidence of the ratepayers' contribution to depreciation. The Commission did not consider any other factors that would be relevant to allocation of a utility's proceeds from the sale of assets. *HN19* The issue of the proper allocation of such proceeds is a complicated [**34] one that cannot be resolved simply by reference to who paid for the property. *See Washington Pub. Interest Org. v. Public Serv. Comm'n, 393 A.2d 71, 72 (D.C. 1978); see also Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n, 158 App. D.C. 7, 485 F.2d 786 (D.C. Cir. 1973); Kansas Power & Light Co. v. State Corp. Comm'n, 5 Kan. App. 2d 514, 620 P.2d 329 (Ct. App. 1980). HN20* A proper allocation of proceeds can be determined only by an analysis of all the equities involved. *See, e.g., Democratic Cent. Comm., 485 F.2d at 821; Kansas Power & Light Co., 620 P.2d at 340.*

*HN21* The equitable principles commonly used to resolve allocation problems are that "benefits should follow burdens" and that "gain should follow risk of loss." *Democratic Cent. Comm., 485 F.2d at 806; Washington Pub. Interest Org., 393 A.2d at 92.* In other words, in the general case, the gain should be allocated to that group (as between shareholders and ratepayers) that has borne the financial burdens (e.g., depreciation, maintenance, taxes) and risks of the asset sold. In addition to these two general equitable factors, courts have also considered numerous other factors, including [**35] whether the asset sold had been included in the rate base over the years, whether the asset was depreciable property, nondepreciable property, or a combination of the two types, the impact of the proposed allocation on the financial strength of the utility, the reason for the asset's appreciation (e.g., inflation, a general increase in property values in the area), any advantages enjoyed by the shareholders because of favored treatment accorded the asset, the dividends paid out to the shareholders over the years, and any extraordinary burdens borne by the ratepayers in connection with that asset. *See Democratic Cent. Comm., 485 F.2d at 791-92, 821-22; id. at 831-32, 841-44*

(MacKinnon, J., concurring in part and dissenting in part); *Washington Pub. Interest Org., 393 A.2d at 89, 91-92; Kansas Power & Light Co., 620 P.2d at 341.*

In the present case, the Commission allocated the sale proceeds in direct proportion to the amount the shareholders and the ratepayers contributed to the cost of the plants. This formula is based on only one of the above principles, that benefits should follow burdens. In addition to ignoring the [*212] other considerations outlined above, [**36] [18] the Commission did not articulate its reasons for concluding that the ratepayers are entitled to a percentage of the proceeds exactly equal to the percentage of the cost they have paid. The Commission cited only the testimony of witnesses Anderson and Bellon but there is no evidence in the record to explain how they reached their conclusions. We therefore hold that the Commission's allocation is not supported by substantial evidence because we find that the evidence the Commission cited does not support its decision and because the Commission failed to consider evidence relating to other relevant factors. We remand the case to the Commission for it to recalculate the allocation of the fixed asset payments along the lines of the analysis suggested above, although we do not require the Commission to consider all of the above factors nor forbid it from considering others. However, the Commission should set forth the factors it considers relevant and should explain how these factors are evaluated in the present case.

[**37] IV

For the reasons stated above, we affirm the judgment of the court of appeals. This case is therefore remanded to the Commission for it to determine the proper allocation between the shareholders and ratepayers of the fixed asset payments after consideration of the factors the Commission determines are appropriate. The Commission is further ordered to allow GSU to recover its purchased price payments in future rate proceedings if GSU shows that the payments are reasonable and necessary expenses.

**Concur by:** GONZALEZ (In Part); MAUZY (In Part)

**Dissent by:** GONZALEZ (In Part); MAUZY (In Part)

| Dissent |
| --- |

*CONCURRING AND DISSENTING OPINION*

---

[18]   The Commission itself had previously recommended that some of these factors be considered in allocation of gain cases. *See* Tex. Pub. Util. Comm'n, *Application of Gulf States Utils. Co. for Authority to Change Rates and Inquiry of the Public Util. Comm'n of Tex. into the Prudence and Efficiency of the Planning and Management of the River Bend Nuclear Generating Station,* Docket Nos. 7195 & 6755, 14 TEX. P.U.C. BULL. 1943, 2217 (May 16, 1988) (suggesting that the analysis described in Judge MacKinnon's concurring and dissenting opinion in *Democratic Cent. Comm.* be used in future allocation cases). While we do not necessarily endorse these precise factors, we do endorse the general approach of considering various equitable factors, such as those discussed in the text, in allocation determinations.

Raul A. Gonzalez, Justice

I concur with the court that PUC's allocation of the fixed asset payments is not supported by the record. However, I disagree with the court's conclusion that PUC's interpretation of its own rule was erroneous or arbitrary. In my opinion, PUC correctly interpreted its own Rule 23.66 to hold that GSU cannot recover from its ratepayers an amount exceeding its "avoided costs." [1] For this reason, I dissent from part II of the court's opinion.

[**38] FEDERAL LAW - THE AVOIDED COST RULE

In 1978, the United States Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA). PURPA established the utility's incremental cost of alternative electric energy as the ceiling on payments to cogenerators. The term incremental cost is defined in the Act as the cost of the energy which, but for the purchase from the cogenerator, such utility would generate or purchase from another source. *16 U.S.C. § 824a-3(d) (1988)*. Incremental cost is referred to as "avoided cost" in the Texas Public Utility Regulatory Act (PURA). *TEX. REV. CIV. STAT. ANN. art. 1446c* (Vernon Supp. 1991). With respect to rates for purchases of electricity from qualifying facilities (QFs), Congress provided that the rate

(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and

(2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

[*213] No such rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the

incremental cost to the electric utility of alternative electric energy.

*16 U.S.C. § 824a-3(b)* [**39] (1988). In enacting PURPA, Congress was mindful to maintain the balance between encouraging cogeneration and not shifting the burden of cost to the ratepayer. The congressional intent for the incremental cost limitation "was to ensure that PURPA did not become a utility-funded welfare program for QFs, since such 'funding' would essentially come from the pockets of electric consumers. *Greensboro Lumber Co. v. Georgia Power Co., 643 F.Supp. 1345, 1369 n.30* (N.D". Ga. 1986), aff'd, *844 F.2d 1538 (11th Cir. 1988)*. The concept of limiting purchased power payments to QFs at or below avoided cost maintains that balance. Pursuant to the authority granted to it by PURPA, the Federal Energy Regulatory Commission (FERC) adopted rules and regulations pertaining to cogeneration and small power production. *18 C.F.R. Part 292 (1990)*. These regulations require the rates for the purchase of electricity from federal qualifying cogeneration facilities to be based on avoided cost and establish avoided cost as the maximum rate. *18 C.F.R. § 292.304(b)(3) (1990)*. The United States Supreme Court has found that FERC has the authority to adopt a full avoided cost rule, and to set full avoided cost [**40] as the maximum rate. *American Paper Inst., Inc. v. American Elec. Power Serv. Corp., 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983)*. [2] FERC has done so. Thus, federal law sets avoided cost as the maximum rate. [3]

[**41] THE PUBLIC UTILITY REGULATORY ACT

In section 41A of the Public Utility Regulatory Act, the Texas legislature enacted similar provisions controlling

[1] "Avoided costs" is defined by the substantive rules of the PUC as:

The incremental costs to an electric utility of electric energy or capacity or both, which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source.

Tex. Pub. Util. Comm'n, 16 TEX. ADMIN. CODE § 23.66(a)(2) (West Sept. 1, 1988) (Arrangements Between Qualifying Facilities and Electric Utilities).

[2] In referring to contractual agreements, the Court cited *18 C.F.R. § 292.301(b)(1)*, which is identical to § 23.66(b)(2)(A), for the principle that "a qualifying facility and a utility may negotiate a contract setting a price that is lower than a full-avoided-cost rate." 461 U.S. at 416 (emphasis added). Thus, the full-avoided-cost rule sets the maximum rate that applies in the absence of a FERC waiver. Nowhere in American Paper is there any indication that a utility and a QF may negotiate a rate that is above avoided cost.

[3] All parties agree that the FERC regulations preempt a contrary interpretation by the PUC. The PUC and the Office of Public Utility Counsel (OPC) contend that the PUC has no authority under federal law to approve a rate in excess of avoided cost. GSU argues that the PUC is misinterpreting the FERC regulation. GSU's interpretation is contrary to the stated purpose of PURPA. If GSU is given free rein to charge the public for QF purchases in excess of avoided cost, the revenue collected from the utility's customers will exceed the revenues that would have been collected if the utility had procured power from other sources. Such a free rein would permit a utility and willing cogenerator to circumvent the rule's protection of the general public by simply converting the transaction into contractual form. So long as the utility may freely pass-through excessive QF prices to the general public, there is no inherent motivation for either the utility or the cogenerator to protect ratepayers from rapidly escalating revenue requirements. This result is inconsistent with the congressional intent behind PURPA.

transactions between electric utilities and qualifying cogenerators. Section 41A states in pertinent part:

(b) If an electric utility and a qualifying facility enter into an agreement providing for the purchase of capacity . . . the commission shall determine whether:

(1) the payments provided for in the agreement over the contract term *are equal to or less than the utility's avoided costs* as established by the commission and in effect at the time the agreement was signed. . . .

PURA, § 41A(b)(1) (emphasis added). Section 41A of PURA requires an automatic determination that prices paid for power from a qualifying facility that are at or below avoided cost are just and reasonable. [4] The PUC's prohibition on prices in [*214] excess of avoided cost conforms to the requirement of PURA § 41A which obligates the PUC to approve an agreement between a QF and a utility so long as it determines that payments "are equal to or less than the utility's avoided cost."

[**42] RULE 23.66(e)(2) - THE AVOIDED COST LIMITATION

Pursuant to its obligation under PURA § 16(g), the PUC enacted rules governing the recovery of fuel costs and agreements between electric utilities and QFs. The PUC limited a utility's recovery of purchased power payments to a QF to that utility's "avoided cost." Tex. Pub. Util. Comm'n, 16 TEX. ADMIN. CODE §§ 23.23(b)(4)(A), 23.66(e) (West Sept. 1, 1988). In pertinent part, section 23.66(e) states:

(1) Rates for purchases of energy and capacity from any qualifying facility shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against qualifying cogeneration and small power production facilities.

(2) Rates for purchases of energy and capacity from any qualifying facility shall not exceed avoided cost; . . . .

(3) Rates for purchases satisfy the requirements of paragraph (1) of this subsection if they equal avoided cost.

The PUC interprets this rule to mean that only if a utility's purchased power payments to the QF equal avoided costs or are lower than the avoided costs may those rates be deemed just and reasonable and in the public interest. [**43] Because GSU's purchased power payments to the

QF were not tied to its avoided cost but rather to a contractual rate, the PUC rejected GSU's request for an automatic pass-through under section 63 of PURA and limited GSU's recovery for those payments from its Texas ratepayers to its avoided cost.

GSU contends that section 23.66(b)(2)(A) allows it to contractually agree to a rate in excess of its avoided cost. Section 23.66(b)(2)(A) provides:

Nothing in this subsection:

(A) shall limit the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions that would otherwise be required by this subsection.

GSU argues that pursuant to section 23.66(b)(2)(A), the avoided cost ceiling in Rule 23.66(e) applies only to contracts that are initiated under the mandatory terms of the rule, as opposed to voluntarily negotiated contracts between electric utilities like GSU and QFs. The PUC rejected this argument. I agree with the PUC.

In a seemingly innocuous statement purporting to interpret Rule 23.66(d), the majority states that "Rule 23.66(e)'s avoided-cost [**44] rules . . . do not apply to voluntary contracts arranged outside the requirements of Rule 23.66(d)." S.W.2d at . Although Rule 23.66(d) does require utilities to purchase power when a QF makes it available, the language of the rule does not support the majority's contention that "the avoided-cost limit applies only to compelled purchases." Id. at . The conclusion that the avoided-cost rules do not apply to voluntary contracts is without foundation. PURA simply does not distinguish between voluntary and involuntary agreements. Subsection 23.66(b)(2) in no way provides that rule 23.66 does not apply to a "negotiated" rate. It merely makes clear that the parties can negotiate a rate other than the avoided cost. *See, e.g.,* 16 TEX. ADMIN. CODE § 23.66(d)(1)(F)(iv) (West Sept. 1, 1988) (when purchasing capacity parties can negotiate for price lower than avoided cost). Nothing in rule 23.66 provides that the utility may recover an amount greater than the avoided cost from the ratepayers.

Further, the court's construction would effectively destroy the avoided cost rule. The court's interpretation allows the utility and QF freedom to agree on a rate as provided [**45] for in section 23.66(b)(2)(A) to trump the rule that

---

[4] Section 41A(c) requires the PUC to certify that the agreement meets the avoided cost limitation of subsection (b)(1). Subsection (c) provides that "in setting the electric utitlity's rates for a period during which the certification is effective, the regulatory authority shall consider payments made under the agreement to be reasonable and necessary operating expenses of the electric utility."

Giana Ortiz

rates for purchases shall not exceed avoided costs (Rule 23.66(e)(2)), yet still requires the agreed rate to "be just and reasonable," as is required [*215] in Rule 23.66(e)(1). There is no logical reason to interpret Rule 23.66(2)(a) to trump Rule 23.66(e)(2), yet be subject to the requirement of Rule 23.66(e)(1). Further, the very avoided cost limitation of Section 23.66(e)(2) which GSU asserts to be inapplicable to "negotiated contracts" contains explanatory language referring to "estimates of avoided costs over the specific term of the *contract* or *other legally 8enforceable obligation.*" Thus, the drafters of section 23.66 envisioned the application of an avoided cost standard to negotiated contracts.

To allow GSU to pass on the costs of production from the venture even if they exceed the avoided cost rule allows utilities to make a complete end run around the rule and in the process completely eviscerate it. In other words, GSU is restricted from raising its rates by the avoided cost rule so it sells its plants to a joint venture in which it maintains an ownership interest. GSU then repurchases the electricity [**46] at a higher rate than its avoided cost and, because of the majority's opinion, is allowed to pass through that extra expense to its Texas ratepayers while creating windfall earnings for GSU's investors. GSU is having its cake and eating it too. It receives management fees, a percentage of the price that is paid to the venture, *and* it receives a profit when that very same energy is sold at higher rates as a result of the production costs that are passed through to ratepayers even though those costs are in excess of the avoided cost rule. This is exactly the type of activity that is prohibited by the avoided cost rule.

An agency's interpretation of its own regulations should be given deference by the courts. *See United States v. Larionoff 431 U.S. 864, 872-73, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); Calvert v. Kadane, 427 S.W.2d 605, 608 (Tex. 1968); Lloyd A. Fry Roofing Co. v. State, 541 S.W.2d 639, 644 (Tex. Civ. App. -- Dallas 1976, writ ref'd n.r.e.).* In my opinion, the PUC's interpretation of its rules is not arbitrary, capricious nor plainly erroneous. Accordingly, I

would hold that the PUC correctly interpreted Rule 23.66 to limit GSU's recovery to its avoided [**47] costs.

## CONCURRING AND DISSENTING OPINION

Oscar H. Mauzy, Justice

This utility case presents two issues involving the respective burdens of shareholders and ratepayers. In disposing of both issues, the majority heeds the complaints of the utility company, but fails to recognize the burdens borne by the ratepayers. I dissent from part II of the majority opinion, and concur only in the result of part III.

As to the first issue, I agree with Justice Gonzalez that Rule 23.66(e) prohibits a utility from recovering purchased power payments in excess of the utility's avoided cost. Nothing in either the language or the history of that rule suggests that its terms are inapplicable to negotiated contracts. Certainly, a utility may contract for a rate which is *lower* than its incremental cost; but the governing federal statute explicitly prohibits the adoption of a rate which exceeds the utility's incremental cost. *16 U.S.C. § 824a-3(b)(1988).* Thus, Rule 23.66(e)(2) should be read to mean exactly what it says: that a utility's purchase rate "shall not exceed avoided cost." *See American Paper Inst., Inc. v. American Elec. Power Serv. Corp., 461 U.S. 402, 416, 103 S.Ct. 1921, [**48] 1930, 76 L.Ed.2d 22, 35 (1983)*("[A] qualifying facility and a utility may negotiate a contract setting a price that is *lower* than a full avoided cost rate.")(emphasis added).

As to the allocation of proceeds from asset sales, I agree that the Commission should have considered factors other than the relative contributions to depreciation. I would emphasize, however, that the Commission's discretion in this context is sharply limited. By shouldering the main financial burdens associated with utilities, and by assuming the risk of loss, ratepayers establish valid interests in utility assets. Those interests must be taken into account whenever such assets are sold; any failure to do so will necessarily rise to an abuse of discretion.

Giana Ortiz

# APPENDIX B

# 2004 TX Educ. Agency LEXIS 17

Copyright (c) 2004 Texas Education Agency
June 15, 2004; June 15, 2004
DOCKET NO. 011-R3-1102

**Reporter:** 2004 TX Educ. Agency LEXIS 17

| PAUL *PASQUA* ; v. ; *FORTSTOCKTON* INDEPENDENT SCHOOL DISTRICT |
| --- |

| Core Terms |
| --- |

reassignment, constructive discharge, high school principal, middle school, fair dealing, good faith, grievance, exhaust, resign, school district

**Panel:** [*1] ROBERT SCOTT, CHIEF DEPUTY COMMISSIONER BY DESIGNATION

| Opinion |
| --- |

## DECISION OF THE DESIGNEE OF THE COMMISSIONER

### Statement of the Case

Petitioner, Paul *Pasqua*, appeals the action of Respondent, *FortStockton* Independent School District, concerning his grievance. Joan Stewart was initially appointed as the Administrative Law Judge to preside over this cause. Subsequently, Christopher Maska was appointed substitute Administrative Law Judge. Petitioner is represented by Sam D. Sparks, Attorney at Law, San Angelo, Texas. Respondent is represented by Shellie Hoffman Crow, Attorney at Law, Austin, Texas.

The Administrative Law Judge issued a Proposal for Decision recommending that Petitioner's appeal be denied. No exceptions were filed.

### Findings of Fact

After due consideration of the record and matters officially noticed, it is concluded that the following Findings of Fact are supported by substantial evidence and are the Findings of Fact that can best support Respondent's decision:

1. For eleven years, Petitioner, Paul *Pasqua*, served as a high school principal for Respondent, *FortStockton* Independent School District.

2. On April 8, 2002, Petitioner received a two-year contract. The [*2] contract was entitled "Two-Year Term Contract for Certified Administrator Position as Assigned." The contract provides:

> 2. The board will pay Employee in twelve installments an annual salary according to the compensation plan adopted by the Board, but in no event less than the 2001/2002 annual salary.
>
> . . .
>
> 4. Employee shall be subject to assignment and reassignment of positions or duties, additional duties, changes in responsibilities or work, transfers, or reclassification at any time during the contract term.

3. On August 19, 2002, after the completion of the first day of the 2002-2003 school year, Petitioner was called to the Superintendent's office and was assigned to the position of assistant middle school principal.

4. Petitioner filled the position of assistant middle school principal until his resignation on November 6, 2002.

5. Petitioner received full compensation until he resigned.

6. Board members did not conduct a meeting without posting notice to decide whether Petitioner should be reassigned.

7. Petitioner did not file a timely grievance concerning the lack of evaluations.

8. Petitioner failed to raise a constructive discharge argument before the board of trustees. [*3]

Discussion

Petitioner contends that Respondent demoted him by reassigning him from high school principal to assistant middle school principal, constructively terminated his contract, failed to evaluate him, and violated the Open Meetings Act. Respondent denies these allegations, alleges that Petitioner failed to exhaust administrative remedies, and argues that the case is moot.

Mootness

Respondent contends that this case is moot because Petitioner has resigned from his contract. However, Petitioner alleges that Respondent's actions amount to constructive discharge. If Petitioner were correct as to the constructive discharge claim, relief could be granted. Based on this allegation, the case is not moot.

Contract

Petitioner contends that his reassignment from high school principal to assistant middle school principal was a demotion which resulted in constructive discharge. Petitioner also contends that his property rights in his contract were violated. The Commissioner's jurisdiction over such claims must be based upon *Texas Education Code section 7.057 (a)*:

> (2) actions or decisions of any school district board of trustees that [*4] violate:
>
> . . .
>
> > (B) a provision of a written employment contract between the school district and a school
> > district employee, if a violation causes or would cause monetary harm.

Petitioner had a property interest in his term contract during the contract's term. The issues are whether the contract was violated and did this result or would it result in monetary harm.

For eleven years, Petitioner served as a high school principal for Respondent. On April 8, 2002, Petitioner received a two-year contract. The contract was entitled "Two-Year Term Contract for Certified Administrator Position as Assigned." The contract provides:

> 2. The board will pay Employee in twelve installments an annual salary according to the compensation
> plan adopted by the Board, but in no event less than the 2001/2002 annual salary.
> . . .
>
> 4. Employee shall be subject to assignment and reassignment of positions or duties, additional duties,
> changes in responsibilities or work, transfers, or reclassification at any time during the contract term.

On August 19, 2002, after the completion of the first day of the 2002-2003 school year, Petitioner was called to the Superintendent's office and was assigned to [*5] the position of assistant middle school principal. Petitioner filled this position until November 6, 2002, when he resigned.

Property Right

Petitioner's contract is not a contract for the position of high school principal. It is a contract for a certified administrator position as assigned. Assistant middle school principal is a certified administrator position. 19 Tex. Admin. Code ch. 241. The Commissioner has held that the professional capacity of administrator is to be broadly interpreted for reassignment purposes. *Carpenter v. Wichita Falls Independent School District,* Docket No. 247-R3-491 (Comm'r Educ. 1993). While Petitioner was not assigned to the assistant principal position until after he had completed his first day of the new school year as a high school principal, the contract itself allows Petitioner to be

reassigned as long as compensation is not reduced from that in the 2001-2002 school year. Petitioner did not lose any compensation. Petitioner's reassignment did not violate his contract.

## Good Faith

Petitioner contends that the timing of the reassignment was unfair and that he should have been given a chance to remediate if his performance were questioned. [*6] Petitioner alleges that if Respondent had notified him at the beginning of the summer that he would be reassigned for the next school year that he could have sought other high school principal positions. During that time frame, districts would still be looking to fill principal positions and Petitioner could still represent that his position with Respondent was high school principal. Petitioner's argument is that Respondent owed Petitioner a duty of good faith and fair dealing. However, in Texas there is no duty of good faith and fair dealing in the employment context. *City of Midland v. O'Bryant, 18 S.W.3d 209, 216 (Tex. 2000).* Further, even if a cause of action for good faith and fair dealing existed, the only damages in the present case would be lost earnings capacity or loss of reputation. The Commissioner lacks jurisdiction over an employment contract case based on such damages. *Smith v. Nelson, 53 S.W.3d 792, 795* (Tex. App.-Austin 2001, pet. denied).

## Constructive Discharge

It has been held that "A constructive discharge occurs when the employer makes conditions so intolerable that a reasonable person in the employee's [*7] position would have felt compelled to resign." *Jett v. Dallas Indep. Sch. Dist., 798 F.2d 748, 755 (5th Cir. 1986)* aff'd in part *109 S.Ct. 2702 (1989).* Petitioner has failed to exhaust administrative remedies as to this issue. Petitioner did not make a constructive discharge argument before the board of trustees. This is not surprising because the board hearing occurred on October 28, 2002 and Petitioner did not resign until November 6, 2002. But even assuming that Petitioner had exhausted administrative remedies he would not prevail. The record does not support a finding that Respondent made Petitioner's working conditions intolerable. While Petitioner's anger at being reassigned is understandable, being assigned to position of less prestige does not by itself constitute constructive discharge.

## Evaluations

Petitioner notes that he was not formally evaluated during the 1999-2000 and 2000-2001 school years. While this could be related to a violation of *Texas Education Code sections 21.354* and 39.054, Petitioner should have brought a grievance as to those events under the district's [*8] grievance policy. *Wittman v. Nelson, 100 S.W.3d 356, 360* (Tex. App.-San Antonio 2002 pet. denied). Respondent limited Petitioner's presentation concerning evaluations to arguments as to how he exhausted local remedies. TR. 4. Even if Petitioner were correct that the failure to provide evaluations violated the school laws of this state, the Commissioner could not as a result order the requested relief of reinstatement and back pay.

## Open Meetings Act

Petitioner contends that board members violated the Open Meetings Act by agreeing to the reassignment of Petitioner outside of a properly called meeting. Tex. Gov't Code § 551.041. The record is scant as to this issue. Petitioner's representative's allegations taken alone do not constitute a violation of the Open Meetings Act. Tr. 16-17. However, the superintendent's testimony was that he made the decision himself without board approval. Tr. 24. The record does not support a finding that a violation occurred. Even if a violation occurred it would not result in the vote on Petitioner's grievance being overturned. A discussion that was not properly conducted according to the Open Meetings Act does not result [*9] in voiding a vote at a properly called meeting on the same subject. *Hill v. Palestine Indep. Sch. Dist., 113 S.W.3d 14, 17* (Tex. App.-Tyler 2000, pet denied).

## Conclusion

Respondent did not violate Petitioner's contract by reassigning Petitioner. Petitioner's contract allowed for the reassignment. Petitioner failed to exhaust administrative remedies as to his constructive termination and evaluation claims. Respondent did not violate the Open Meetings Act. Petitioner's appeal should be denied.

## Conclusions of Law

Giana Ortiz

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact, in my capacity as Designee of the Commissioner of Education, I make the following Conclusions of Law:

1. The Commissioner has jurisdiction to hear this cause under *Texas Education Code section 7.057* except as specified in Conclusions of Law Nos. 2, 6-8.

2. Because Petitioner failed to exhaust administrative remedies as to his constructive discharge and evaluation claims, the Commissioner lacks jurisdiction over these claims. *19 Tex. Admin. Code § 157.1056(a)* [*10] .

3. As pled, this case is not moot.

4. Assistant middle school principal is a certified administrator position. 19 Tex. Admin. Code ch. 241.

5. Petitioner's reassignment did not violate his contract.

6. There is not a duty of good faith and fair dealing in the employment law context.

7. The Commissioner lacks jurisdiction over Petitioner's good faith and fair dealing claim. *19 Tex. Admin. Code § 157.1056(a)*.

8. Even if there were a duty of good faith and fair dealing in the employment context, jurisdiction would not exist under *Texas Education Code section 7.057(a)(2)(B)* because the Commissioner lacks jurisdiction on a claim of lost earnings capacity or loss of reputation. *19 Tex. Admin. Code § 157.1056(a)*.

9. Members of Respondent's board of trustees did not violate the Open Meetings Act as they did not preapprove Petitioner's reassignment outside of a properly called meeting. Tex. Gov't Code § 551.041

10. Even if members of Respondent's board of trustees had violated the Open Meetings Act by preapproving Petitioner's reassignment outside of a properly [*11] called meeting, this does not result in the board's vote to deny Petitioner's grievance being declared void.

11. Petitioner's appeal should be denied.

ORDER

After due consideration of the record, matters officially noticed and the foregoing Findings of Fact and Conclusions of Law, in my capacity as Designee of the Commissioner of Education, it is hereby

ORDERED that Petitioner's appeal be, and is hereby, DENIED.

SIGNED AND ISSUED this 15th day of JUNE, 2004.

# APPENDIX C

PRINCIPAL
QUALIFICATIONS

In addition to the minimal certification requirement, the principal shall have at least:

1.  Working knowledge of curriculum and instruction;

2.  The ability to evaluate instructional program and teaching effectiveness;

3.  The ability to manage budget and personnel and coordinate campus functions;

4.  The ability to explain policy, procedures, and data;

5.  Strong communications, public relations, and interpersonal skills;

6.  Three years' experience as a classroom teacher;

7.  Prior experience in instructional leadership roles; and

8.  Other qualifications deemed necessary by the Board.

| | |
|---|---|
| **EMERGENCY PLACEMENTS**<br>DAEP | The principal or the principal's designee is not prohibited from ordering the immediate placement of a student in a disciplinary alternative education program (DAEP) if the principal or designee reasonably believes that the student's behavior is so unruly, disruptive, or abusive that it seriously interferes with a teacher's ability to communicate effectively with students in class, with the ability of students to learn, or with the operation of school or a school-sponsored activity. |
| **EXPULSION** | A principal or designee may order the immediate expulsion of a student if the principal or designee reasonably believes that such action is necessary to protect persons or property from imminent harm. |
| **PROCEDURE** | At the time of an emergency placement or an emergency expulsion, the student shall be given oral notice of the reason for the action. The reason must be a reason for which placement in a DAEP or expulsion may be made on a nonemergency basis. Within a reasonable time, but not later than the tenth day after the placement or expulsion, the student shall be accorded the appropriate due process required for a removal or an expulsion. [See FOA, FOC, and FOD] |
| **STUDENTS WITH DISABILITIES** | If the student is a student with disabilities who receives special education services, the emergency placement is subject to federal law and regulations and must be consistent with the consequences that would apply under Education Code Chapter 37, Subchapter A, to a student without a disability. [See FOF] |
| **IMMUNITY** | A principal or designee is not liable in civil damages for an emergency placement. |
| | *Education Code 37.019* |
| **TITLE 5 FELONY OR AGGRAVATED ROBBERY** | The Board or designee, after an opportunity for a hearing may expel a student and elect to place the student in an alternative setting as provided below if: |

1. The student has been arrested for, charged with, referred to a juvenile court for, received deferred prosecution for, received probation for, received deferred adjudication for, found by a court or jury to have engaged in, or been convicted of, conduct defined as a felony offense in Penal Code, Title 5 [see FOC(EXHIBIT)] or the felony offense of aggravated robbery under Penal Code 29.03; and

2. The Board or the Board's designee determines that the student's presence in the regular classroom:

   a. Threatens the safety of other students or teachers;

b.   Will be detrimental to the educational process; or

c.   Is not in the best interests of the District's students.

The Board or designee may expel the student and order the placement regardless of:

1.   The date the conduct occurred;

2.   The location of the conduct;

3.   Whether the conduct occurred while the student was enrolled in the District;  or

4.   Whether the student has successfully completed any court disposition requirements imposed in connection with the conduct.

ALTERNATIVE SETTING

The student must be placed in:

1.   A juvenile justice alternative education program (JJAEP), if the District is located in a county that operates a JJAEP or the District contracts with the juvenile board of another county for the provision of a JJAEP; or

2.   A DAEP.

DURATION OF PLACEMENT

Notwithstanding Education Code Section 37.009(c) or (d) (placements beyond one year) or any other provision of Education Code Chapter 37, Subchapter C, the student is subject to the placement until:

1.   The student graduates from high school;

2.   The charges are dismissed or reduced to a misdemeanor offense; or

3.   The student completes the term of the placement or is assigned to another program

These provisions continue to apply if the student transfers to another district in the state.

The student is entitled to periodic review [see FOC at 120-DAY REVIEW OF STATUS].

Any decision of the Board or designee under the above provisions is final and may not be appealed.

The above provisions apply notwithstanding any other provision of Education Code Chapter 37, Subchapter A, except that Section 37.007 (expulsion) prevails to the extent of a conflict.

*Education Code 37.0081*

REGISTERED SEX
OFFENDERS

APPLICABILITY

The following provisions apply to a student who is required to register as a sex offender under Code of Criminal Procedure, Chapter 62 (Chapter 62), but not to a student who is no longer required to register as a sex offender, including a student who receives an exemption from registration or a student who receives an early termination of the obligation to register.

REMOVAL FROM
REGULAR
CLASSROOM

Notwithstanding any provision of Education Code Chapter 37, Subchapter A, on receiving notice under Code of Criminal Procedure article 15.27 or Chapter 62 that a student is required to register as a sex offender, the District shall remove the student from the regular classroom and determine the appropriate placement.

*Education Code 37.302–.303*

STUDENT UNDER
COURT
SUPERVISION

The District shall place a student who is a registered sex offender and who is under any form of court supervision, including probation, community supervision, or parole, in the appropriate alternative education program for at least one semester.

If a student transfers to another district during the placement, the district to which the student transfers may:

1.  Require the student to complete an additional semester in the appropriate alternative education program without conducting a review of the student's placement for that semester; or

2.  Count any time spent by the student in an alternative education program in the district from which the student transfers toward the mandatory placement requirement.

*Education Code 37.304*

STUDENT NOT
UNDER COURT
SUPERVISION

The District may place a student who is a registered sex offender and who is not under any form of court supervision in the appropriate alternative education program for one semester or in the regular classroom.  The District may not place the student in the regular classroom if the Board or designee determines that the student's presence in the regular classroom:

1.  Threatens the safety of other students or teachers;

2.  Will be detrimental to the educational process; or

3.  Is not in the best interests of the District's students.

*Education Code 37.305*

APPROPRIATE
PROGRAM

Except as provided below, the District shall place a student who is required by the Board or designee to attend an alternative education program in a DAEP.  *Education Code 37.309*

EXCEPTION

The District shall place the student in a JJAEP if:

1.  The memorandum of understanding between the District and juvenile board provides for the placement of students who are registered sex offenders in JJAEP; or

2.  A court orders the placement of the student in a JJAEP.

A JJAEP is entitled to funding for the student in the same manner as for students who are subject to discretionary expulsion.

*Education Code 37.309–.310*

REVIEW

At the end of the first semester of a student's placement, the Board or designee shall convene a committee to review the placement.

REVIEW COMMITTEE

The committee must be composed of:

1.  A classroom teacher from the campus to which the student would be assigned were the student not placed in an alternative education program;

2.  The student's parole or probation officer or, in the case of a student who does not have a parole or probation officer, a representative of the local juvenile probation department;

3.  An instructor from the alternative education program to which the student is assigned;

4.  A District designee selected by the Board or designee; and

5.  A school counselor employed by the District.

RECOMMEN-DATION

The committee by majority vote shall determine and recommend to the Board or designee whether the student should be returned to the regular classroom or remain in the alternative education program.

If the committee recommends that the student be returned to the regular classroom, the Board or designee shall return the student to the regular classroom unless the Board or designee determines that the student's presence in the regular classroom:

1.  Threatens the safety of other students or teachers;

2.  Will be detrimental to the educational process; or

3.  Is not in the best interests of the District's students.

If the committee recommends that the student remain in the alternative education program, the Board or designee shall continue the student's placement in the alternative education program unless

the Board or designee determines that the student's presence in the regular classroom:

1.   Does not threaten the safety of other students or teachers;

2.   Will not be detrimental to the educational process; and

3.   Is not contrary to the best interests of the District's students.

If the Board or designee determines that the student should remain in an alternative education program, the Board or designee shall reconvene the committee before the beginning of each school year to review the student's placement in an alternative education program.

*Education Code 37.306*

APPEAL

A student or the student's parent or guardian may appeal a decision by the Board or designee to place the student in an alternative education program by requesting a conference among the Board or designee, the student's parent or guardian, and the student. The conference is limited to the factual question of whether the student is required to register as a sex offender under Chapter 62.

If the Board or designee determines at the conclusion of the conference that the student is required to register as a sex offender, the student is subject to placement in an alternative education program.

The decision of the Board or designee is final and may not be appealed.

*Education Code 37.311*

LIABILITY

The above provisions regarding placement of a student who is a registered sex offender do not:

1.   Waive any liability or immunity of a governmental entity or its officers or employees; or

2.   Create any liability for or a cause of action against a governmental entity or its officers or employees.

*Education Code 37.312*

SPECIAL
EDUCATION
STUDENT

The placement of a student with a disability who receives special education services must be made in compliance with the Individuals with Disabilities Education Act (20 U.S.C. Section 1400 et seq.).

The review of the student's placement may be made only by a duly constituted ARD committee [see EHBAB]. The ARD committee

may request that the Board or designee convene a review committee to assist in conducting the review.

*Education Code 37.307*

TRANSFER STUDENTS

Except where a student under court supervision transfers during a mandatory placement, the District shall determine whether to place a transfer student who is a registered sex offender in the appropriate alternative education program or in a regular classroom. The District shall follow the procedures at REVIEW, above, in making the determination. *Education Code 37.308*